GRASON ELECTRIC COMPANY, et al., Plaintiffs,

v.

SACRAMENTO MUNICIPAL UTILITY DISTRICT, Defendants.

Civ. No. S–79–861 LKK.

United States District Court, E.D. California.

Sept. 23, 1983.

Robert A. Susk, G. Joseph Bertain, Jr., San Francisco, Cal., for plaintiffs.

John F. Downey, David S. Kaplan, Sacramento, Cal., Ronald F. Lipp, Cloverdale, Cal., for defendants.

## MEMORANDUM AND ORDER

KARLTON, Chief Judge.

Long in gestation, a new theory of liability under the federal antitrust laws was delivered by the Second Circuit Court of Appeals in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). For want of a better term, this theory may be described as "monopoly leveraging." It purportedly derives from the more traditional and better defined offense of monopolization, which is proscribed by Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. The essence of the new theory is that "a firm violates § 2 by using its monopoly power in one market to gain an unwarranted competitive advantage in another." *M.A.P. Oil Co., Inc. v. Texaco, Inc.,* 691 F.2d 1303, 1305–06 (9th Cir.1982).

The plaintiffs in the case at bar are thirteen electrical contractors who do business in and around Sacramento, California; they are suing the publicly owned utility that provides electricity to much of the greater Sacramento area. This opinion considers only the plaintiffs' motion for summary judgment specifically on a "monopoly leveraging" theory.[1] They claim that the defendant has unlawfully used its alleged monopoly power in the retail electrical energy market to preclude the plaintiffs from obtaining work constructing what they call "electrical distribution systems," and to compete unfairly for work installing and maintaining street lighting and outdoor (security) lighting systems.

It would take very little to establish that the plaintiffs have not, for summary judgment purposes, made out the necessary elements of their monopoly leveraging claims. Nonetheless, it appears worthwhile to explore these claims at some length in order to attempt to narrow the focus of the legal and factual inquiry which they present. As I shall explain, the appellate courts have made that task fairly complicated by announcing what amounts to a new antitrust offense without exploring the practical ramifications of that expansive move.

1. The plaintiffs have alleged a number of violations under sections 1 and 2 of the Sherman Act. In bringing this motion, however, the plaintiffs have elected to proceed solely on their monopoly leveraging claim, which they refer to as a cause of action for monopolization under section 2. Thus the court does not now consider or express any opinion on the plaintiffs' claims under section 1 of the Sherman Act, nor their attempted monopolization claim under section 2. Nor has the court yet been presented with the plaintiffs' more usual section 2 monopolization claim, *i.e.,* the allegation that defendant has "monopolized" the "markets" for "electrical distribution systems" and "street and outdoor lighting systems." Finally, the court has elected to bifurcate its consideration of the plaintiffs' motion itself. The court has reserved consideration of the plaintiffs' request for summary judgment on defendant's affirmative defenses until it determines whether the plaintiffs are entitled to summary adjudication regarding the "prima facie" elements of their monopoly leveraging theory. In summary, this memorandum is concerned only with whether the plaintiffs would be entitled to judgment on the theory set forth in *Berkey Photo,* assuming arguendo that the defenses cannot stand. Finally, while it is of course part of any prima facie case to demonstrate that the court has jurisdiction over the subject matter of the action, the question of whether the jurisdictional prerequisites of the Sherman Act are met in this case is raised by defendant's third and fourth defenses. Thus consideration of that question will be deferred pending further argument.

# I
## THE SUMMARY JUDGMENT STANDARD

There are repeated suggestions in the cases that the summary judgment device is somehow different when it is invoked in the context of an antitrust action. Thus it has been noted that "summary judgment is disfavored in antitrust cases in which motive and intent are important factors...." *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 at 901 (9th Cir. July 12, 1983), *citing Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Nonetheless, "its use is not prohibited and may save judicial resources." *Aydin, supra, citing First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). In short, although the court will entertain such a motion, "[t]he moving party is subject to a 'particularly rigorous' burden in antitrust cases." *Aydin, supra* at 902, *quoting Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir.1977); *accord, Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 280 (9th Cir.1976), *cert. denied* 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977).

 As with much of the lore of antitrust law, the precise significance of the foregoing is lost on this workaday judge. It is of course important to recognize that questions of intent and motive are not generally susceptible to disposition on summary judgment, whether they arise in the antitrust context or elsewhere. *See Soto v. County of Sacramento*, 563 F.Supp. 520, 541 (E.D.Cal.1983); *see generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (2d ed. 1983). Moreover, because antitrust actions frequently turn on such inquiries into state of mind, and because they are often quite complex, they are "by their very nature poorly suited to disposition by summary judgment." *Id.* § 2732.1 at 313; *see also* II P. Areeda & D. Turner, *Antitrust Law* § 316b (1978) [hereinafter cited as II Areeda & Turner]. While these observations commend caution in proceeding in this con-

text, they do not seem to establish the existence of a standard for antitrust summary judgment motions that is different in substance from the usual standard applied by courts when they consider motions under Fed.R.Civ.P. 56. II Areeda & Turner, *supra* at 62 ("The suggestion that summary procedures are less appropriate in antitrust cases as such may be put aside, for the Federal Rules make absolutely no distinction between antitrust and other cases." *Id., discussing Poller v. CBS, supra.*) Indeed, the same cases which gravely point out the "particular rigors" facing a party who moves for summary judgment in the antitrust context go on to delineate the applicable standard in precisely the same terms generally used to adjudicate motions under Rule 56. *See Aydin* at 902; *Mutual Fund Investors*, 553 F.2d at 624–25; *Javelin Corp.*, 546 F.2d at 280. Accordingly, I shall employ that familiar set of tools in disposing of the present motion.

Summary judgment is proper only when the materials submitted by the moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Aydin* at 901–902. It is well settled that the moving party has the burden of establishing that this standard is satisfied. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Program Engineering, Inc. v. Triangle Publications*, 634 F.2d 1188, 1192–93 (9th Cir.1980). However, if the moving party is successful in making out a prima facie case, that would entitle that party to a directed verdict if uncontradicted at trial, summary judgment will be granted unless the opposing party "present[s] specific facts demonstrating that there is a [triable] factual dispute about a material issue." *Program Engineering, Inc.* at 1193; *see Aydin* at 902. Throughout this process, "all evidence and inferences therefrom are to be construed in the light most favorable to the party opposing the motion." *Mutual Fund Investors*, 553 F.2d at 624, citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "Nevertheless, the opponents' version of the facts

must support a viable legal theory which would entitle them, if accepted, to a judgment as a matter of law." *Mutual Fund Investors,* 553 F.2d at 624.

Given the manner in which this motion was couched (*see* n. 2, *infra*), another observation regarding the summary judgment process is particularly in order. As this court has noted elsewhere, "in all summary judgment motions, the court's task is the discovery of material disputes of fact, not their resolution." *Kouba v. Allstate Ins. Co.,* 523 F.Supp. 148, 154 (E.D.Cal.1981), *rev'd on other grounds,* 691 F.2d 873 (9th Cir.1982); *see also* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 200[06] (1982) (hereinafter Weinstein & Berger) ("The [summary judgment] device is not intended to resolve issues which are within the traditional province of the trier of fact,

but rather to see whether there are such issues." Weinstein & Berger, at 200–31, *quoting* James, *Civil Procedure* ¶ 6.18 (1965)). With these principles in mind, I turn first to an examination of the factual assertions underlying this motion.

## II
## FACTUAL BACKGROUND [2]

The defendant Sacramento Municipal Utilities District (SMUD) is a public entity created pursuant to state law.[3] Its primary business is the retail sale of electrical energy. At the time that the complaint was filed in this action, SMUD's service area covered some 757 square miles including and adjacent to the City of Sacramento. Like most electric utility companies, SMUD is virtually the exclusive supplier of retail electricity within its service area.[4] Unlike

---

2. The plaintiffs have styled their motion as one for summary judgment, "or in the alternative for partial summary judgment and for an order specifying facts without substantial controversy...." Obviously, it would aid the prompt and expeditious disposition of this case if the court could oblige the plaintiffs by reciting a detailed and comprehensive list of material facts that are no longer genuinely in dispute. Unfortunately, none of the parties has dealt with this motion in a manner that would facilitate the court's efforts in this regard. The plaintiffs are attempting to try a very complex case, using a new theory, on a summary basis. The inherent difficulties in doing this are greatly compounded by the highly colored, consistently tendentious manner in which the plaintiffs present what they would have the court accept as undisputed facts and established principles of law. For its part, the defendant refuses, almost without exception, to concede even the most obvious points. In short, the plaintiffs will not admit that any issue is genuinely in dispute, and the defendant will not allow that any is undisputed. The biggest problem caused by the plaintiffs' overzealousness and the defendant's obdurate stance is that both sides have buried themselves so deeply in the battle that they have done very little to ascertain for themselves or the court what the contours of the legal dispute really are, and hence which facts are *relevant*. Without more definition, the court is reluctant to enter the fray regarding such matters as whether the defendant may purchase electricity wholesale from the Bonneville Power Administration, or how many electric power poles the defendant installs in a year. Thus the sort of catalog sought by the plaintiffs is clearly out of the question. The court will, however, attempt to

narrow the issues of fact; to that end, the facts stated by the court throughout this memorandum should be regarded as established unless the specific matters discussed are identified as mere allegations, or otherwise in dispute.

3. The complicated nature of SMUD's status as a public body, and the somewhat obscure statutory framework from which it arose are discussed in some detail by my brother Ramirez in his earlier decision in this case. *Grason Elec. Co. v. Sacramento Municipal Utility District,* 526 F.Supp. 276 (E.D.Cal.1981) (denying SMUD's motion for judgment on the pleadings; that motion was based on the theory that SMUD is immune from antitrust liability under the "state action" exemption recognized in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny).

4. The establishment of this simple fact presents a splendid example of the phenomenon discussed in n. 2, *supra.* The plaintiffs attempt to support their assertion in this regard by citation to the pleadings; the defendant, in its opposition, notes that it denied in its answer that it was the exclusive supplier of retail electricity in its service area; the plaintiffs respond to that observation by dubbing the fact "uncontroverted by SMUD." Thus the plaintiffs simply choose to ignore their own failure of proof, and the defendant, with absolutely no attempt at clarification, just leaves hanging a simple but fundamental factual issue rather than make the plaintiffs' (and the court's) task one whit easier. In an answer to one of the plaintiffs' interrogatories, however, the defendant explains its denial by pointing out that owners of certain mobile home parks have been permitted

many other utilities, however, SMUD (through its Board of Directors) makes its own rules and sets its own rates and charges. *See* Cal.Pub.Util.Code § 11885. Thus it can fairly be said that SMUD has absolute control over the price paid for electrical energy in its service area.

The plaintiffs allege—and SMUD indignantly denies—that SMUD engages in business activities other than simply the retail sale and distribution of electricity. Specifically, the plaintiffs allege that SMUD constructs and maintains what the plaintiffs term "electrical distribution systems" in the SMUD service area. The plaintiffs also claim that SMUD is unfairly competing with them for work constructing what they call "street and outdoor lighting systems." SMUD's activities in these areas form the basis of this action; thus in order to explain what the parties are arguing about it is necessary to describe what is meant by "electrical distribution systems," "street lighting systems" and "outdoor lighting systems," and to attempt to tie those descriptions to undisputed facts regarding events in the real world.

The retail sale of electricity necessarily contemplates the distribution of that energy to the consumer. It is obvious that, up to a point, the installation and maintenance of facilities and equipment necessary to the delivery of retail electricity to SMUD's customers are merely part of SMUD's lawful activities as a provider of electrical energy.

The assumption underlying this litigation is that, at some point, the delivery of SMUD's product turns into a different product (or service) in itself. In other words, the plaintiffs assert that there is some point, between the construction of high-voltage electric transformers and the act of screwing in a light bulb or plugging in a toaster, where SMUD's delivery of its product ends and a different activity commences. Whether such a point exists, and if so where precisely that point is to be fixed are the essential questions underlying the dispute regarding "electrical distribution systems."

According to the plaintiffs, the critical point at which SMUD's lawful delivery of its product is transformed into an unlawful encroachment on free enterprise is fixed geographically; it is "the outer property line of the property for which new electrical service is required." Thus all of the wiring and other equipment connecting the off-property SMUD feed lines to the on-property structure which requires electric service, taken together, compromise the "electrical distribution system," or EDS.[5]

SMUD admits that it carries power through its own facilities, across property lines, and often well past the boundaries described by plaintiffs. Indeed it is undisputed that, in the case of private residences, SMUD installs and maintains power lines and equipment right up to the meter box attached to an outside wall of the house

by SMUD to "submeter" electricity in order to adjust rental charges for energy consumption. Plaintiffs' Exhibit 20, Defendant's Answer to Plaintiffs' First Set of Interrogatories, Interrogatory No. 5. It appears that such limited resale of electricity is of little or no consequence to the facts relevant to this case.

5. The plaintiffs define an electrical distribution system as "all of the permanent or temporary electrical distribution lines and related equipment between the service equipment at the dwelling or other structure and the point of termination of the conductors at the source of feed thereof, at or outside of the property line. The property line means the outer property line of the property for which new electrical service is required. In the case of a development or subdivision in which the interior streets . . . are to be dedicated, the outer property line of the entire development is the property line. [¶]

The distribution system ordinarily includes, but is not limited to all service entrance conductors, service laterals, service conductors, clusters, pedestals, or other junction connectors, secondary conductors, transformers, primary conductors, conduit, ducts, vaults, manholes, pullboxes or other subsurface structures, transformer pads, trenching, backfill and compaction." Plaintiffs' Memorandum filed September 14, 1981 at 24–25. Purely for the sake of convenience, I shall refer to the complex of wiring, connections and other hardware described by the plaintiffs as the "EDS." In doing so, I do not mean to suggest that I am persuaded that the thing described by the plaintiffs is in any real sense separable from the entire electrical distribution network maintained by SMUD. By doing so I certainly do not imply that there is in reality a separate market or submarket for electrical distribution systems.

itself. SMUD asserts that it has traditionally performed these services in connection with private residences, dating back to the time when most electricity was provided to private homes via low voltage lines run directly from off-premises SMUD poles to connecting points on the exterior of the houses.

SMUD admits, however, that there was a period when it did not run lines all the way to private residential structures. Sometime in the 1960's, overhead connecting lines run from pole to private structure fell into disfavor, and SMUD began running its service lines underground. In the case of private residences, SMUD ended its underground distribution at a "pedestal" located on the owner's property, but some distance from the house itself. During that period SMUD permitted—and indeed required—the owner of the individual residence (in fact, generally the developer of the residential subdivision) to provide his or her own connective wiring between the pedestal and the house. This connective work was presumably performed in large measure by private electrical contractors such as the plaintiffs.

In 1973, however, SMUD, in its words, "resumed its historic practice of serving to the residential customer's meter." Memorandum in Opposition at 231 (filed Feb. 1, 1982). In other words, SMUD's rules require that only SMUD may install the electrical distribution equipment from the property line to the house meter box. The customer (again, usually the developer) is required to pay SMUD a fee for the work. According to the plaintiffs, the fee charged is less than what it would cost for them to do the work for the customer.[6] In any event, there is far less work than there was prior to 1973 for electrical contractors installing "electrical distribution systems" in the SMUD service area.

Much of what the parties argue about is centered on the provision of service to single-family dwellings, as described above. The parties apparently focus their arguments on this phenomenon because it provides a useful paradigm for the larger discussion regarding SMUD's distribution services, and perhaps because the construction of EDS's for private residences is the single greatest concern of the plaintiffs. In any event, it must be noted that the plaintiffs are not *merely* concerned with SMUD's distribution of energy (past property lines) to individual houses. Rather, they contest SMUD's activities in bringing power across the property lines of various customers, including multi-family residences, commercial developments (such as shopping centers), and industrial developments. All of these activities, the plaintiffs claim, constitute unlawful encroachment on what would otherwise be free competition for the construction of necessary distribution facilities. SMUD responds that all of its operations within and without customers' property lines are consistent with SMUD's mandate. That mandate, SMUD says, is to bring electrical energy in a form that can be used by the given customer and to a place where it is useful to the customer.[7]

In addition to their allegations regarding electrical distribution systems, the plaintiffs complain of SMUD's activities in the construction and maintenance of "street and outdoor lighting systems." Although the plaintiffs lump them together in this fashion, it appears that the terms "street lighting systems" and "outdoor lighting sys-

---

**6.** In 1978, the price charged by SMUD for providing an underground "EDS" was $250.00 per "residential service run" (to use SMUD's terminology). *See* SMUD Rule and Regulation 15 (July 6, 1978), included in Exh. 78 to the plaintiffs' memorandum in support of their motion for summary judgment.

**7.** In this regard, SMUD points out that for large industrial consumers, it provides electricity at a high voltage to the customer's property and permits the industrial customer to construct

and maintain facilities to "step down" the power to a voltage that meets the customer's specific needs. Similarly, in the case of an apartment house or a shopping center, SMUD does not run the power to each individual unit, but rather provides service as far as an on-property transformer; the owner of the property may (and indeed must) connect the various structures or units to the transformer. The significance of SMUD's policies will be discussed further below.

tems" describe two somewhat different things which, for analytical purposes, should be described separately.

Street lighting systems are generally defined in SMUD's Rates 51, 52 and 53 (1978) as outdoor lighting services supplied by customer-owned or SMUD-owned facilities for streets, highways, bridges, public parks and various kinds of schools. Under Rate 51, the customer builds and maintains the system, and pays SMUD a set rate based on the wattage used per month. Under Rate 52, the customer installs and continues to own the system, but SMUD does the necessary maintenance work on the street lamps and other equipment. Finally, under Rate 53, SMUD constructs, operates and maintains the street lighting system, and retains ownership of it. Both Rate 52 and 53 provide that the customer shall pay SMUD a fixed, monthly charge per lamp, based on the type and wattage of lamp used.

The plaintiffs' allegations with regard to street lighting systems differ from the claims regarding electrical distribution systems in that the plaintiffs do not allege that SMUD has entirely precluded electrical contractors from competing for the desired work by adopting a restrictive regulation.[8] Rather, the plaintiffs point to the fact that developers, public entities, etc., which desire such systems can have them installed by SMUD under Rate 53 at no initial charge— instead, the costs of installation and maintenance are absorbed into SMUD's rate structure and thus are recovered via monthly charges to all customers participating in the Rate 53 program. Moreover, developers and other such customers who contact SMUD regarding the provision of electricity for street lighting are informed of SMUD's "package deal" under Rate 53. As will be discussed more fully below, these facts are at the core of the plaintiffs' charge that SMUD engages in anti-competitive practices in the construction and maintenance of street lighting systems.

What the plaintiffs refer to as "outdoor lighting systems" involve a somewhat different set of facts than those discussed in relation to "street lighting systems;" indeed, they are perhaps more accurately described by the plaintiffs in their briefs as a "security light service" provided by SMUD. Pursuant to its Rates 71 through 78 (1978), SMUD places outdoor lights on its (pre-existing) utility poles for residential and commercial customers who wish to have specific areas illuminated for security purposes or other unspecified reasons. Again, SMUD makes no initial charge for installation, and bills the customer a flat monthly rate based on the type and wattage of lamp used. It is undisputed that SMUD refuses to allow the plaintiffs, or indeed anyone other than a SMUD employee, to place lamps on its utility poles.

The plaintiffs allege that they are in competition with SMUD in that each of them is "ready, willing and able" to construct electrical distribution systems and street lighting systems, and to provide "security light services." The plaintiffs are all licensed electrical contractors, doing business in the SMUD service area, and are capable of doing most or all of the work entailed in constructing those various systems, according to their undisputed declarations.

The common thread running through the plaintiffs' allegations concerning electrical distribution systems, street lighting systems, and "outdoor" or "security light services," is the contention that SMUD has used its alleged monopoly power in the market for the retail sale and distribution of electric energy to thwart competition in other areas. Before examining the merits of the plaintiffs' claims regarding each of the activities described above, it appears appropriate to discuss the nature and development of the unifying theory upon which the plaintiffs seek to rely.

---

**8.** The defendant has tendered to the court evidence showing that almost 80% of the street lighting which has been installed in its service area since 1975 has been under Rate 51, *i.e.,* constructed and maintained by the customer through private electrical contractors or otherwise.

## III

## THE GENESIS AND CONTOURS OF "MONOPOLY LEVERAGING"

■ In attempting to resolve the issues tendered by the instant motion, I sometimes felt as if I had ventured through the looking glass. Accordingly, I shall follow the advice given Alice and begin at the beginning. In this motion, the plaintiff asserts a "monopolization" claim under Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2.[9] Unlike Section 1 of the Sherman Act, which broadly prohibits all activities that "unreasonably" restrain interstate or international trade, see Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), Section 2 fixes more narrowly on a specific economic problem: monopoly power. In the words of a leading commentator:

> Focusing on the private monopolization of trade or commerce, Section 2 seeks to promote market competition by preventing large aggregations of economic power from being built unfairly. Its primary goal is to prevent a firm or group of firms from acquiring or maintaining monopoly power through abusive or inequitable practices.

II E. Kintner, Federal Antitrust Law § 11.1 at 301 (1980) (hereinafter II Kintner).

As I shall explain, the claim pressed by plaintiffs in the present motion does not relate in any direct sense to this "primary goal" of Section 2. The monopoly leveraging theory, as articulated in Berkey Photo and its progeny does not attack either the acquisition or the maintenance of monopoly power in a given market; rather it seeks to curb the abuse of otherwise lawful monopoly power in markets other than the one in which the power is held. While this aim is not inconsistent with the purposes of the Sherman Act, it does present analytical problems which are quite different from those usually encountered in Section 2 monopolization claims.

■ Monopoly power is classically defined as "the power to control prices or exclude competition" in a relevant market. United States v. DuPont & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). In order to restrict the development of monopoly power, Congress created three "separate and distinct offenses" under Section 2: monopolization, attempt to monopolize, and combination or conspiracy to monopolize. II Kintner, supra at 301. The framers of the Sherman Act recognized, however, that mere possession of monopoly power may be altogether "innocent" and, indeed, may be the result of healthy and beneficial economic activity. See DuPont, 351 U.S. at 390–91, 76 S.Ct. at 1004–05; I E. Kintner, Federal Antitrust Law § 4.14 (1980) (hereinafter I Kintner). Thus in fleshing out the substantive Section 2 offenses, the courts have required a showing of something more than that the alleged violator possesses monopoly power.

■ In the context of a monopolization claim—purportedly what is at issue here—the Supreme Court has specified that a monopoly is not unlawful unless the actor "has illegally acquired it, or, on the other hand, . . . unless he has 'maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under section one.'" Levi, A Two Level Anti-Monopoly Law, 47 Nw.U.L.Rev. 567, 580–81 (1952), quoting United States v. Griffith, 334 U.S. 100, 106, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). The elements of a monopolization claim are therefore generally stated as (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. E.g., Forro Precision, Inc. v. IBM Corp., 673 F.2d 1045, 1058 (9th Cir. 1982).

In the claim being considered here, however, the plaintiffs do not assert that SMUD holds a monopoly in the "markets" which would normally be considered "rele-

---

**9.** Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty . . . [of an offense under the Act]."

vant" for purposes of analyzing a monopolization claim, *i.e.,* the economic areas in which the plaintiffs seek to compete with SMUD. Nor do they dispute the legitimacy of SMUD's alleged monopoly over the retail sale of electrical energy, for the plaintiffs are not contending, in any ordinary sense, that SMUD acquired or maintained that alleged monopoly unlawfully. In short, the instant motion does not tender a claim of "monopolization of a relevant market," as that offense has traditionally been understood.

 It does not follow, however, that the plaintiffs have failed to state a "monopolization" claim under Section 2. As I have noted, the courts have recognized that a firm which has used monopoly power, lawfully acquired in one market, to "gain an unwarranted competitive advantage" in another market, has committed the offense of monopolization even though it has sought neither to maintain nor expand its monopoly in the first (or "monopoly") market, nor to acquire monopoly power in the disputed markets. *M.A.P. Oil Co.,* 691 F.2d at 1305–06; *Berkey Photo,* 603 F.2d at 275. This somewhat anomalous result may be traced, in some measure, to the felt need of the courts to police certain activities of monopolists, although those activities may not otherwise constitute antitrust violations. In the instant case, for example, the plaintiffs' allegations regarding electrical distribution systems resemble various practices which would be proscribed by Section 1 of the Sherman Act[10]—most notably "tying arrangements."[11] In that claim, however, the plaintiffs are concerned only with the alleged unilateral conduct of SMUD; they do not establish the *concerted* activity required for a violation of Section 1. *See Berkey Photo,* 603 F.2d at 272; II Kintner, *supra* § 11.5. Similarly, the plaintiffs' claims bear some of the features of an

attempted monopolization claim under Section 2. While such a claim is asserted elsewhere in the complaint, the plaintiffs do not presently contend that SMUD acted with the specific intent to monopolize, which is the *sine qua non* of an attempt action. *See Forro Precision, Inc.,* 673 F.2d at 1059.

In sum, federal antitrust law, at least in theory, failed to address certain anticompetitive conduct by monopolists that was undertaken unilaterally and without the purpose of acquiring or maintaining monopoly power either in the monopoly market or the second, disputed market. This theoretical gap led at least one commentator (prior to the *Berkey Photo* decision) to suggest that the courts recognize a new and "unique" Section 2 offense prohibiting abuses of monopoly power. *See* Hawk, *Attempts to Monopolize—Specific Intent As Antitrust's Ghost in the Machine,* Cornell L.Rev. 1121, 1156–59 (1973).

The court's, however, rather than treating the problem as unaddressed by the statutes seemed to suggest that the need was already filled by existing antitrust law. The most important example is probably the Supreme Court's statement that "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *United States v. Griffith,* 334 U.S. at 107, 68 S.Ct. at 945; *see also, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973), *reh'g denied,* 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973); *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 712 n. 2 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

Despite the ringing words of the *Griffith* opinion, the precise significance of that case

---

**10.** Section 1 (15 U.S.C. § 1) provides, in pertinent part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal...."

**11.** "A tying arrangement is an agreement by a party to sell one product only on the condition

that the buyer also purchase a different or 'tied' product." *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 540 (9th Cir.1983); *see also* L. Sullivan, *Handbook of the Law of Antitrust* 431 (1977). Thus under the allegations in this case, the electrical distribution systems could be viewed as a product or service "tied" by SMUD to the purchase of electrical energy.

is shrouded in mystery. The facts of *Griffith* have been described, and the opinion dissected, in great detail by the commentators. *See, e.g.,* II Kintner, *supra* § 12.15. As Kintner fairly points out, "[t]he Supreme Court's opinion in *United States v. Griffith* is subject to at least four differing interpretations." *Id.* 410 U.S. at 389, 93 S.Ct. at 1035. Among those interpretations is that the Court was condemning "the mere use of monopoly power to obtain competitive advantages in another market as a *separate offense* under section 2 of the Sherman Act." *Id.*[12] A better reading of *Griffith,* however, is probably that it concerned an attempt by a party with monopoly power in one market to monopolize a second market; under this analysis the significance of the monopolists' "abuse" of its power was that it proved the specific intent to monopolize which is an essential element of an attempt claim. In any event, the latter explanation of *Griffith* was apparently the one adopted by the author of that opinion, Justice Douglas, in a subsequent opinion written for the Court. *See Otter Tail Power Co.,* 410 U.S. at 377, 93 S.Ct. at 1029; *see also* Hawk, *supra* at 1128.

In summary, prior to the *Berkey Photo* decision, there was discussion both in case and commentary regarding the abuse of monopoly power, but it was unclear what the significance of such abuse was in the context of Section 2 of the Sherman Act. *See* Levi, *supra* at 571; Hawk, *supra* at 1156–57. As I have noted, *Otter Tail* apparently stands for the proposition that such abuses supply the necessary "specific intent" element where the charge is an unlawful attempt to monopolize a second

market. Other cases have held that the abuse of monopoly power in a second market *to maintain or preserve that power* in the first, or monopoly market, established the "willful maintenance" element of a claim that the defendant had committed the offense of monopolization with regard to the first market. *E.g., Greyhound Computer Corp. v. IBM Corp.,* 559 F.2d 488, 503 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). Still other cases establish that when a monopolist actually attains monopoly power in the second market through abuse of a monopoly in the first market, that abuse is sufficient to show that the second monopoly was acquired "willfully." *E.g., Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372, 1385–86 (5th Cir.), *reh. denied,* 618 F.2d 1389 (5th Cir.), *cert. denied sub nom, Woodlands Telecommunications Corp. v. Southwestern Bell Tel. Co.,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). None of these cases really aid the plaintiffs in the context of this motion, however, for plaintiffs do not presently contend that SMUD is attempting to monopolize any of the disputed areas of competition within the meaning of Section 2; nor do they assert (for purposes of this motion) that SMUD has attained a monopoly in any of those "markets," nor that SMUD's activities vis-a-vis electrical distribution systems, street lighting, or outdoor lighting systems in any sense "preserved" SMUD's alleged monopoly of the retail sale of power.

In sum, the theory relied upon by the plaintiffs in this motion was not clearly articulated until Judge Kaufman announced the Second Circuit's opinion in *Berkey Photo,* 603 F.2d 263.[13] That lawsuit

---

**12.** This interpretation is closest to the one advanced by the plaintiffs in support of this motion; the important difference, of course, is that the plaintiffs view their theory as a form of monopolization claim rather than some separate form of Section 2 offense. In addition to this interpretation and the alternative explanation of *Griffith* as an attempt case (*see* discussion in text, *infra*), Kintner posits two other interpretations of the Court's opinion. First, he suggests that the Court was saying that the abuse of monopoly power to expand *that* monopoly constitutes the offense of monopolization under Section 2. Second, he raises the possibility that what the Court meant was that

the abuse of monopoly power evidenced a *conspiracy* to monopolize a second market. II Kintner, *supra* § 12.15 at 389.

**13.** The "monopoly leveraging" theory set forth in *Berkey Photo* apparently had been employed, although not really explained, in a few earlier cases. *See* P. Areeda, *Antitrust Law* ¶ 729.4c (1982 Supplement). The most significant earlier case was probably *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 711–12 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). The court in that case seemed to view proof of

was brought by Berkey Photo, Inc. ("Berkey"), a "prominent participant" in the amateur photographic industry against the Eastman Kodak Company ("Kodak"), "the preeminent firm" in that industry. *Id.* at 267. At trial, Berkey established that Kodak held monopoly power in the markets for amateur conventional still cameras, film (other than "instant" film) used by amateur photographers, and "color paper—that is, paper specially treated so that images from color film may be printed on it. . . ." *Id.* at 267–73. The jury found, moreover, that Kodak used this power to gain an advantage in markets for photofinishing services and equipment, in which Kodak held no monopoly. On the basis of this conduct and resultant injury to the plaintiff, the jury awarded very substantial damages to Berkey.

For our purposes, the vital question among those raised on appeal in *Berkey Photo* was "whether a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market." 603 F.2d at 275. The Second Circuit held, "as did the lower court, that it does." *Id.* In an elegantly written opinion, Judge Kaufman traced the development of anti-monopoly jurisprudence under Section 2 of the Sherman Act, beginning with the passage of the statute and the consequent creation by Congress of " 'a new jurisdiction [in the federal courts] to apply a "common law" against monopolizing.' " [14] *Id.* at 272, *quoting* 3 P. Areeda & D. Turner, *Antitrust Law* 40 (1978). After defining monopoly power in conventional

antitrust terms, and explaining why such power is "inherently evil," *Id.* at 272–73, Judge Kaufman went on to explain that, nonetheless, "§ 2 does not prohibit monopoly *simpliciter*—or, as the Supreme Court phrased it in the early landmark case of *Standard Oil Co. of New Jersey* . . . , 'monopoly in the concrete.' " *Id.* at 273, *quoting* 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). Rather, he noted that monopoly power is not unlawful unless it is acquired or maintained "willfully"—with the intent to engage in anti-competitive conduct. *Id.* at 273–75.

As the fulcrum upon which this Section 2 see-saw is balanced, Judge Kaufman identified the following rule: "[A] monopolist is tolerated but not cherished. Thus . . . the mere existence of monopoly power 'whether lawfully or unlawfully acquired,' is in itself violative of § 2, 'provided it is coupled with the purpose or intent to exercise that power.' " *Berkey Photo,* 603 F.2d at 274, *quoting Griffith,* 334 U.S. at 107, 68 S.Ct. at 945. To the extent, therefore, that a monopolist, which has acquired its power lawfully, uses the advantages that derive from its size and integration to compete in its own market or elsewhere it does not offend the Sherman Act. *Berkey Photo,* 603 F.2d at 274. That "lawful" monopolist, however, violates the law when it uses its power "to beget monopoly." *Id.* at 275, *quoting Griffith,* 334 U.S. at 108, 68 S.Ct. at 946. More importantly, by striking the balance in the place that he did, Judge Kaufman was led to the "inexorable interpretation of the antitrust laws" that the use of monopoly power to gain competitive advantage offends Section

"monopoly leveraging" as a means of inferring the intent (*i.e.,* "willfulness") necessary to establish monopolization of the first market. *Id.* at 711–12. The significance of this theoretical approach is discussed in the text, *infra.*

14. While it is clear from the statutory history that Congress desired the courts to develop a federal "common law" in this area, that phrase has several meanings, and it is by no means clear which of those meanings applies to the antitrust field. Simply put, it is one thing to conclude that Congress meant to create three substantive offenses under Section 2 of the Sherman Act (monopolization, attempted monopolization, and conspiracy to monopolize),

but left it to the courts to fill in the necessary definitions of the elements of those offenses (*e.g.,* the definition of "monopoly," or of "attempt"). It is something quite different to suggest that Congress intended to give the courts *carte blanche* to create new causes of action consonant with the underlying policy of the Act, and merely specified the three Section 2 offenses in order to give the courts some idea as to what it had in mind when it enacted the legislation. It is in this light that the question of whether "monopoly leveraging" is a "new" Section 2 offense—as opposed to being some variant on one of the original three offenses—may be of greatest significance.

2, regardless of whether that use of power is in any sense directed towards the acquisition or preservation of monopoly. *Id.* at 275.

The *Berkey Photo* opinion, by virtue of its adoption in *Mapp,* seems to have settled the question in this circuit of whether a "pure" monopoly leveraging theory exists; moreover, the opinion provides some description of the doctrinal basis of that theory. In a sense, however, the opinion raised more questions than it answered.

First of all, *Berkey Photo* did not directly address the issue of whether "monopoly leveraging" merely provides a necessary element for a finding of liability under one of the three specified Section 2 offenses, or whether that doctrine describes a new and separate substantive offense under the Act. Although the opinion describes the offense of monopolization (and the monopolization cases) at some length, it appears that the purpose of that discussion is only to uncover the policies underlying Section 2, and to trace the manner in which those policies have been effectuated by the courts. The court evinces from its discussion a general rule regarding the legal limitations on monopoly power, and announces that that rule is violated any time monopoly power is used to gain a competitive advantage. This ana-

lytical process clearly speaks to the purpose of the statute itself rather than the limits and possibilities of any pre-existing statutory offense, and thus seems to be describing a new and different way of proceeding under the Act—that is, a new Section 2 offense. To the extent that there is any question about the courts' power to create such an offense (*see* n. 14, *supra*), the Second Circuit's analysis simply does not address the question.[15]

The Ninth Circuit may, however, be read as having the view that *Berkey Photo* merely describes a species of monopolization claim under Section 2. *See M.A.P. Oil Co. v. Texaco, Inc.,* 691 F.2d at 1305–06. This explanation, while avoiding the questions raised in nn. 14 & 15, itself raises further problems. First, of course, is the urgent matter of what the defendant is charged with doing. That question becomes more difficult the more one considers the question, for *Berkey,* like *Griffith* before it, is subject to multiple interpretations. Keeping in mind, however, that *Berkey* apparently does not require actual monopolization or attempted monopolization of the contested market, the only readily apparent answer is that the defendant's conduct in the "second" market raises an inference sufficient to support the conclusion that the

**15.** The power of the courts through the "federal common law," to create an entirely new cause of action not in terms authorized by statute, where Congress has provided specific remedies, is like many of the problems of "federal common law," "a very complicated question, which yields to no simple answer. . . ." Wright *The law of Federal Courts* 4th Ed. 388. While clearly this issue is not exactly the same as a question of an implied right of recovery for the breach of a federal statute by someone injured by the breach, *see Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), nor a question of whether a statute supplants pre-existing "federal common law," *see City of Milwaukee v. Illinois & Michigan,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), nor a question of filling a legislative "intersticial" gap of the kind created when Congress does not supply a statute of limitations, *see DelCostello v. Teamsters,* —— U.S. ——, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), many of the same considerations which inform such decisions would appear to apply. By observing that this issue is different from more

traditional "federal common law" questions, I do not mean to suggest that the federal courts are foreclosed from such activity. *See, e.g., Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (holding money damages available to union members for a violation of the duty of fair representation) or *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (providing a common law remedy of money damages for violation of the Fourth Amendment). Nonetheless, as Justice Harlan demonstrated in his concurring opinion in *Bivens,* such questions are agonizingly difficult. Again, I do not suggest that *Berkey* was wrongly decided, I merely note that *Berkey* does not address the issue. It may be that the Court in *M.A.P. Oil Co. v. Texaco, Inc.,* 691 F.2d 1303 (9th Cir.1982), perceiving this problem's difficulty, sought to avoid it by construing *Berkey* as a conventional section 2 cause of action without specifying which form of section 2 violation was at stake. If so, as I describe in the text, the circuit avoided one set of theoretical problems only to engender a second set.

firm is "willfully" maintaining its monopoly power in the "first" (or "monopoly") market. If this reading is correct in the instant case, we are to understand that if SMUD is indeed using its power as a lever outside of the market for retail electrical energy, that fact "proves" that SMUD is "willfully maintaining" its power *within* that market; SMUD's conduct vis-a-vis, *e.g.,* electrical distribution systems is relevant, under this analysis, only insofar as it evidences SMUD's intent to control retail electricity sales. Given that no one has suggested that SMUD has acted "willfully" to acquire or maintain the monopoly granted it by both state law and "natural" economic conditions, this analysis is an elaborate fiction at best. Certainly it is a departure from "[t]he basic formula for illegal monopolization [*i.e.*] 'exclusionary' behavior that achieves, maintains, or increases monopoly power *in a given market.*" P. Areeda, *Antitrust Law* ¶ 729.4 at 178 (1982 Supplement) (emphasis added).

This theoretical gap leads back to the second, more practical, set of problems that arise in the wake of the *Berkey Photo* decision: What must the plaintiffs prove in order to make out their claim? Obviously the relatively straightforward elements of a conventional monopolization claim do not speak to the situation where a firm is operating in two markets and is doing so without the purpose of obtaining or preserving monopoly power in either market. (Again, it must be recalled that, at least for this motion, the plaintiffs assert only that SMUD has a lawful monopoly in retail elec-

tric power which it is using to gain "an unwarranted competitive advantage" in other markets). *Berkey Photo* seems to interpose "use of monopoly power to gain competitive advantage" as a new element, in the place of "willful acquisition or maintenance of monopoly power." The slipperiness of the distinction between "use of monopoly power", however, and lawful use of the advantages brought by size and integration has led to criticism of that decision.[16] Moreover, it is not entirely clear from the *Berkey Photo* opinion whether it condemns the use of monopoly power *per se,* or whether that power may legitimately be used in some contexts—although it appears that the latter answer is the one intended. Finally, the opinion is silent as to the extent to which the second (or "leveraged") market must be defined, if at all.[17]

In this last regard, fortunately, recent Ninth Circuit authority is of some help. First, it appears relatively clear that the activity complained of must entail an abuse of the monopoly power itself, as opposed to the mere use of competitive advantages which the defendant enjoys for some reason distinct from its power to set prices or exclude competition from the first market. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 545–46 (9th Cir. 1983). (It of course remains this court's task to give life to that distinction).

Second, the challenged use of monopoly power must involve something more than the seeking of competitive advantage in another market; the advantage sought

---

16. Indeed, one commentator has suggested that, at least on this score, the *Berkey Photo* opinion is susceptible to the same criticisms that Judge Kaufman levels against Learned Hand's decision in *United States v. Aluminum Co. of America (Alcoa),* 148 F.2d 416 (2d Cir. 1945). *Antitrust Advisor* 80–81 (1982 Cumulative Supplement). In Judge Kaufman's pretty formulation, the *Alcoa* opinion is "a litigant's wishing well, into which, it sometimes seems, one may peer and find nearly anything he wishes." *Berkey Photo,* 603 F.2d at 273.

17. The sketchy quality of the *Berkey Photo* opinion seems to have encouraged the plaintiffs in the case at bar to argue initially that their cause of action was actually very simple. In

fact, the plaintiffs asserted that little more need be established than that SMUD had monopoly power, that the plaintiffs sought to do some work that SMUD was doing, and that SMUD prevented them from doing that work. Such a theory proves too much; it is consistent neither with *Berkey Photo* nor with the body of antitrust law as a whole to say that a holder of lawful monopoly power must passively concede everytime someone else demands the right to do some portion of what that firm does, regardless of whether the services at issue are performed within the scope of the lawfully acquired monopoly and regardless of whether the "monopolist" is merely conducting itself in the way that any other (non-monopolist) firm would under the circumstances.

must be "unwarranted." *M.A.P. Oil,* 691 F.2d at 1305–06. While it is unclear as to whether the Ninth Circuit meant the word "unwarranted" to be a new term of art in antitrust law, its significance in this context is not particularly obscure. It should be remembered that the Ninth Circuit was discussing what it viewed as a Section 2 "monopolization" claim, and thus was specifically addressing the element of "willful acquisition or maintenance." *Id.* The Ninth Circuit has repeatedly held that "in determining whether a defendant's conduct constitutes the willful acquisition or maintenance of monopoly power required for the offense of monopolization, 'the test is whether the defendant's acts, otherwise lawful, were *unreasonably* restrictive of competition.'" *Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377, 1382 n. 2 (9th Cir.1983), *quoting California Computer Products, Inc. v. IBM,* 613 F.2d 727, 735–36 (9th Cir.1979). The "reasonableness" standard, in turn, has taken on meaning through its constant use as a tool of antitrust jurisprudence, particularly in the context of litigation under Section 1 of the Sherman Act. *See generally* L. Sullivan, *Handbook of the Law of Antitrust* 171–182 (1977). In this circuit the "reasonableness" test in cases under Section 2 is the same standard as that traditionally invoked in Section 1 litigation. *Transamerica Computer Co.,* 698 F.2d at 1382–83 n. 2. The application of this standard to the facts of the instant case will be discussed, *infra,* in relation to the specific claims of the plaintiffs.

Finally, the *M.A.P. Oil* case makes it abundantly clear that in order to prevail the plaintiffs must define both the market in which monopoly power is allegedly held, and the separate markets in which the leveraging of that power has allegedly taken place. 691 F.2d at 1305–08. This requirement serves at least two purposes in the context of a monopoly leveraging claim. Initially, there can be no unlawful leverag-

ing unless the defendant is seeking a competitive advantage in the provision of goods or services that is analytically distinct from the supply of those goods and services over which the defendant has a lawful monopoly. *Id.*[18] Furthermore, the requisite showing of "unreasonableness" necessarily imports an understanding of the perimeters of the leveraged markets, for the fundamental inquiry in that regard is whether the defendant's practices have a *significant* effect on competition in each of those markets. This inquiry is perforce directed to the effect on competition in each market as a whole; "[t]o amount to an unreasonable restraint of trade the anticompetitive conduct must have an effect greater than its effect upon the plaintiff[s'] business." *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *see also Aydin Corp. v. Loral Corp.,* 718 F.2d 897 at 902 (9th Cir. July 12, 1983). All of this follows from the axiom that the "antitrust laws ... were enacted for the protection of competition, not competitors ...." *Gough,* 585 F.2d at 386, *citing Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ In summary, the courts of appeal have not precisely defined the elements of a "monopoly leveraging" claim, and the apparent doctrinal inconsistencies in the various opinions, regarding the nature of that claim, have made it difficult for this court to spell out those elements with any great confidence. Nonetheless, through cross-reference and interpolation, it is possible to set forth the following as the structure of what the plaintiffs must prove: First, that SMUD possesses monopoly power in a "relevant market"; second, that the activities of which the plaintiffs complain occurred in a defined market (or markets), distinct from the first (or monopoly) market; third, that

---

**18.** *Cf. Berkey Photo,* 603 F.2d at 275–76 (noting that the "monopoly leveraging" theory is "linked to the prohibition against tying arrangements in the sale of goods and services," and citing to, inter alia, *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73

S.Ct. 872, 97 L.Ed. 1277 (1953). In the *Times-Picayune* case, the Court held that there can be no unlawful leveraging via "tying" where the tied and tying products are part of the same market and are thus indistinct. *Id.* at 613–14, 73 S.Ct. at 882–83).

those activities involved a use of SMUD's monopoly power, rather than mere employment of other advantages that SMUD enjoys by virtue of size, integration, etc.; fourth, that SMUD sought or gained an "unwarranted competitive advantage" in the "leveraged" market or markets (*i.e.* that SMUD's conduct amounted to an "unreasonable restraint of competition"); lastly, that the challenged conduct caused injury to the plaintiffs of the sort cognizable under the antitrust laws.

Having identified the essential elements, the next task is to determine whether the plaintiffs have satisfied those elements in regard to each of their pending claims. The threshold question—whether SMUD in fact possesses monopoly power—is common to all of the claims; I shall thus begin with that as a discrete inquiry.

## IV

### SMUD'S MONOPOLY POWER

In a brief submitted to the court, SMUD admits that it "has a legal monopoly in the sale of electricity" which includes "electrical energy generation, transmission and distribution." Supplemental Memorandum in Opposition at 1, 3 (June 15, 1982). Yet in the same brief, and throughout its moving papers, SMUD denies that it holds an "economic monopoly" of the sort regulated by the antitrust laws. *E.g., id.* at 2. There is no apparent content to this distinction except that it neatly describes SMUD's litigation posture.[19] SMUD defines a "monopoly at law" as "rights *de jure* to perform a service." *Id.* at 2. Monopoly in any sense —legal, economic or other—imports something more, however. The term necessarily implies that the described "rights" are in some sense enjoyed free from the vicissitudes of competition.[20] Moreover, monopo-

ly, within this ordinary understanding of the term, is precisely what Congress sought to regulate when it passed the Sherman Act. *See* III P. Areeda & D. Turner, *Antitrust Law* ¶ 617 (1978). Although more precision may be needed for determining whether a firm has violated the law in any specific manner, the *Griffith* case illustrates that a leveraging analysis may begin with the determination that the defendant "has a monopoly in the popular sense." 334 U.S. at 106, 68 S.Ct. at 945. As I shall explain, the more complicated analytical process upon which SMUD insists really does nothing to alter the unremarkable "popular" conclusion that SMUD indeed has a monopoly which is a monopoly which is a monopoly.

Once again, "[m]onopoly power is the power to control prices or exclude competition." *Betaseed, Inc. v. U. & I. Inc.,* 681 F.2d 1203, 1231 (9th Cir.1982), *citing, inter alia, United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). This of course means something more than that the defendant, like most firms, decides what price it will charge the public; it involves the ability to set prices without fear of competition. "A firm cannot impose monopoly prices if buyers are free to purchase a competitor's goods." *General Business Systems v. No. Amer. Philips Corp.,* 699 F.2d 965, 972 (9th Cir.1983). Thus in order to determine whether a firm possesses monopoly power, courts generally begin by ascertaining the relevant market, *i.e.* "the arena within which the strength of competitive forces is measured." II Kintner, *Federal Antitrust Law* § 12.2 at 325, *quoting* P. Areeda, *Antitrust Analysis* 133 (2d ed. 1974). In ascertaining the relevant market,

---

**19.** SMUD's stance, in essence, is that if possession of monopoly power by dint of State law means that SMUD is exempt from federal antitrust regulation, then SMUD has a monopoly. If, on the other hand, SMUD is not immune under the "state action exemption" (*see* n. 3, *supra*), then its otherwise conceded monopoly evaporates—in this lawsuit, if not in real life.

**20.** Given the semantic stratagem adopted by SMUD, a standard dictionary definition of the

term provides a handy point of reference: "*monopoly* ... 1: exclusive ownership through legal privilege, command of supply, or concerted action 2: exclusive possession 3: a commodity controlled by one party 4: a person or group having a monopoly." *Webster's Seventh New Collegiate Dictionary* 548 (1967). I do not suggest that Webster's necessarily provides a viable definition of a term of art; rather, my resort to Webster's is merely an attempt to understand what is being said to the court.

it is vital to bear in mind the point of the exercise: "Market definition is not a jurisdictional prerequisite, or an issue having its own significance under the statute; it is merely an aid for determining whether power exists." L. Sullivan, *Handbook of the Law of Antitrust* 41 (1977).

"Markets are primarily defined by specification of the product(s) and geographic area(s) included within them." II Kintner, *Federal Antitrust Law* § 12.2 at 325; *see, e.g., General Business Systems*, 699 F.2d at 972.[21] Put another way, "the proponent of [the monopoly leveraging] theory must identify the relevant product and geographic markets as a threshold requirement." *M.A.P. Oil*, 691 F.2d at 1306. The first question, then, is whether the plaintiffs have identified the appropriate product market within which to measure SMUD's economic power.

■ "In defining the relevant product market, it must be determined which products have a sufficient competitive impact on the product of the defendant to be considered collectively in deciding whether the defendant possesses monopoly power." II Kintner, *Federal Antitrust Law* § 12.3 at 325–26. "Thus, all products that are 'reasonably interchangeable,' and so can be said to compete for the buyers' dollars, are included in the [product] market definition." *General Business Systems*, 699 F.2d at 972, *quoting United States v. E.I. duPont & Co.*, 351 U.S. at 395, 76 S.Ct. at 1007. "In sum, defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *Smith-Kline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.1978), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), *quoted in Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir.1979), *cert. denied*,

447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

Not surprisingly, the plaintiffs seek to define the product market as narrowly as possible; in short, they would limit it to the basic "product" which SMUD sells. Thus the plaintiffs assert that the "appropriate product" for purposes of this inquiry is "electric energy," and, more specifically, that SMUD's monopoly encompasses the generation, transmission and distribution of electricity to the extent that those activities are part of the "sale of the commodity electric energy." Their basic thesis is that there is no reasonable substitute for electricity.

This is scarcely a radical notion; indeed, plaintiffs cite this court to other cases in which the same basic issue was either summarily resolved by the trial court or conceded outright by the defendant electric utility company. *See City of Mishawaka v. American Electric Power Co.*, 465 F.Supp. 1320, 1325 (N.D.Ind.1979), *aff'd in part, rev'd in part on other grounds*, 616 F.2d 976 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824; *reh'g denied*, 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981); *United States v. Otter Tail Power Co.*, 331 F.Supp. 54, 58 (D.Minn.1971), *aff'd in part, vacated in part on other grounds*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *reh'g denied*, 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973), *aff'd*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). What other courts have done in other cases gives little aid to the plaintiffs in this case, however, for market definition is a factual inquiry. *E.g., Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). Again, the plaintiffs bear the burden of showing that there is no genuine issue as to the material facts of this case.

The unhappy reality is that the plaintiffs have presented very little evidence to sup-

---

**21.** In the *General Business Systems* case, the Ninth Circuit described the "dimensions" of the relevant market as including "the product involved, the geographical limits within which it functions, and the appropriate time frame." 699 F.2d at 972. The last is of no particular moment in the instant case, for there is no suggestion by either side that the relevant market (however defined) has been undergoing any significant changes during the period relevant to this litigation. *See* II Kintner, *Federal Antitrust Law* § 12.2 at 325.

port their assertions regarding the product market. Their evidentiary showing consists in large part of passages culled from various SMUD annual reports that demonstrate the widespread and varied use of electricity in several sectors of the economy, generally in the context of discussions regarding energy saving techniques employed by SMUD's customers. Nowhere in the tendered material, however, does the defendant admit that electricity is irreplaceable. To demonstrate this essential fact, the plaintiffs rely almost entirely on their request that the court take judicial notice that "there is no substitute for electric energy." Unfortunately, despite the reams of written argument submitted to the court, the parties have given virtually no attention to the legal question of whether it is proper for the court to use the evidentiary device of judicial notice in the manner proposed by the plaintiffs.

Federal Rule of Evidence 201 provides that a trial court may take judicial notice of an "adjudicative fact," provided that the "judicially noticed fact [is] not subject to reasonable dispute in that it is ... generally known within the territorial jurisdiction of the court." *Id.* "[A]djudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case." K. Davis, 2 *Administrative Law Treatise* 353, *quoted in* Fed.R. Evid. 201 advisory committee note. There is no doubt that the disputed matter in this case—the "substitutability" of electric energy—is such "an adjudicative fact." Moreover, "[j]udicial notice may be taken at any stage of the proceedings." Fed.R.Evid. 201(f). Thus the device may appropriately be used in the context of a motion for summary judgment. 1 *Weinstein's Evidence* ¶ 200[06].

The real issue is whether the asserted fact that "there is no substitute for electric energy" is "not subject to reasonable dispute." At first glance this seems a dubious proposition. Put in somewhat more sophisticated terms, "substitutability" is an inquiry into the extent to which there are "cross-elasticities of demand" in the con-

sumption of various products. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953); *see United States v. E.I. duPont & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. As the defendant fairly observes, such a determination generally requires a detailed examination of "market data, figures or other relevant material adequately describing the nature, cost, usage or other features of competing products." *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 919 (8th Cir.1976).

At this juncture it is important to reiterate that the analytical tools applied by the courts in this area are not ends in themselves; thus the fact that complex economic situations require the court to employ painstaking methods does not mean that antitrust law mandates such an elaborate factfinding procedure in every case. It appears to this court that in regard to the specific issue of the relevant market within which SMUD's power is to be measured, this is a relatively straightforward case indeed. Assuredly, the notion of "reasonable interchangeability" of products is sufficiently subtle that the court cannot merely coat that determination with judicial notice and swallow it whole. Doing so would create the substantial risk that the court was relying on suppressed, and quite possibly erroneous assumptions about how things are in the real world. *See* 1 *Weinstein's Evidence* ¶ 200[06] at 200–31. There are, however, a number of facts that the court can know to be "not subject to reasonable dispute," which, taken together, provide adequate support for the ultimate factual conclusion urged by the plaintiffs.

It is beyond reasonable dispute that everyday life here in SMUD's service area involves reliance on a host of sophisticated devices, ranging from the electronic machinery used to prepare this opinion to the ubiquitous television set. For the most part, these modern instruments obviously require some external source of energy in order to function, and the vast majority of them depend on electricity to supply that energy. The court is unaware of any electronically powered device in common usage

that could, without significant alteration, be run on some other form of energy. Moreover, it is a matter of daily experience that virtually all buildings, houses and other structures—at least within this jurisdiction—are equipped with convenient outlets for electric energy to which these devices may be connected. At present, no other form of generated energy is available for use in this casual and convenient manner.

█ In short, there is no alternative to which consumers could readily turn should they desire to live their lives as they presently do, but without electricity. These facts, derived from common daily life and not susceptible to genuine dispute, are together sufficient for a trier of fact to conclude, in the absence of other evidence, that there is no other product which is reasonably interchangeable with electric energy. As such they are sufficient to satisfy the initial burden placed on the plaintiffs in regard to this issue. *See SEC v. Murphy,* 626 F.2d 633, 640 (9th Cir.1980). Accordingly, the burden shifts to SMUD to "come forward with specific facts showing that there remains a genuine factual issue for trial." *Id.*

SMUD's response, essentially, is that to confine the product definition to electric energy is to define the market too narrowly. SMUD asserts that there are other forms of energy and "energy conservation products" which could conceivably be used by consumers to substitute, in some measure, for electricity. Thus the defendant submits evidence showing that most of their customers have "actual or potential access to natural gas ... or propane or butane." Memorandum in Opposition at 51. SMUD also has provided the court with an affidavit executed by Winston Ashiwaza, a professional conservationist in SMUD's employ. Mr. Ashiwaza lists 29 sorts of "commercial and industrial appliances and equipment" and 9 sorts of "residential appliances and equipment" "which could operate on other energy sources than electric." The lists are composed mostly, though not exclusively, of heating or refrigeration devices, and the affiant indicates which of those things are "readily available locally" in a design not dependent on electricity.

The defendant's argument misses the point. The applicable test is whether other products are "reasonably interchangeable" with electricity, not whether consumers could conceivably turn to them as a partial substitute for that form of energy. As the Supreme Court has explained:

For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, *within reasonable variations in price,* only a limited number of buyers will turn; in technical terms, products whose "cross-elasticities of demand" are small.

*Times-Picayune Publishing,* 345 U.S. at 612, n. 31, 73 S.Ct. at 882, n. 31 (emphasis added). Or again, in a passage quoted in SMUD's opposition brief:

In the case of a product [the relevant market] may be of such a character that substitute products must also be considered, as the customer may turn to them if there is a slight increase in the price of the main product. That is the teaching of the du Pont case [citation], viz., that commodities reasonably interchangeable make up that "part" of trade or commerce which § 2 protects against monopoly power.

*United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

SMUD has come forward with no evidence from which it could reasonably be inferred that a "reasonable variation" or a "slight increase" in the price of electricity has led or would lead consumers to resort to other forms of energy to fill the myriad needs that are presently filled by electricity. Frankly, it seems incredible to suggest that anything short of a truly drastic rise in the retail cost of electricity would cause consumers to scrap the electrically powered appliances that they currently own in favor of purchasing new ones powered by some other source, to convert existing equipment, or to forego entirely or in any large measure the use of electricity. This point is underscored by the fact that any large-scale switch to alternative forms of energy would

perforce require structural changes in virtually every room of every building in daily use. In short, the only reasonable conclusion to be drawn from the evidence now before the court is that there is no other product which is "reasonably interchangeable" with electrical energy; thus that product provides the appropriate point of reference for determining the "relevant market" within which to test SMUD's economic power.

■ The question of which geographic area is appropriate for this purpose is even more readily resolved. Once again, it is important to focus on the purpose of the inquiry: To ascertain the area in which SMUD effectively competes. In the words of the Supreme Court:

> It is clear, of course, that the "line of commerce" affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area.... Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition.

*Standard Oil Co. v. United States,* 337 U.S. 293, 299–300 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).[22] As Professor Sullivan points out,

> Geographic market definitions are made for the same purpose as product market definitions. If sellers of a product within a given geographic area can increase price or cut production without a prompt flow of supply into the area from outside of it, those sellers are operating in a separate market from sellers in other areas.

L. Sullivan, *Handbook of the Law of Antitrust* 67 (1977).

The undisputed evidence in the instant case is that SMUD is, for all intents and purposes, the sole seller of electricity within its service area. Should SMUD raise its prices to a level which consumers find uncomfortable, there is simply no other provider of the product that could readily come into that area and offer cheaper electricity to the public. Again, SMUD's own arguments illustrate this fact. Its chief assertion in this regard is that if consumers who would otherwise be in SMUD's service area find SMUD's prices too high, they could choose to locate elsewhere. In other words, if SMUD customers, actual or potential, don't like the way that the defendant operates its business or the prices it charges, they can move. This hardly describes a group of consumers who enjoy the benefits of effective competition in the marketplace.

■ The fact is that in the area in which SMUD operates, it is effectively free of competition for the sale of electricity. There is simply no more sensible geographic area to use in defining the market in which to measure SMUD's power, for there is no other market in which SMUD operates, or in which other firms can pose a realistic threat to SMUD.[23] In summary, the relevant market for determining the scope of SMUD's economic power is the one suggested by the plaintiffs: The sale of electrical energy within the SMUD service area. Given that SMUD is the sole firm of any size operating in this market, and that SMUD sets the rates that it charges consumers of its product, it follows ineluctably

**22.** The *Standard Oil* case arose under Section 3 of the Clayton Antitrust Act, 15 U.S.C. § 14. It is well established, however, that the "relevant market" inquiry under the Sherman Act is identical to that employed in cases arising under the Clayton Act. *See United States v. Grinnell Corp.,* 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778; *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1300 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).

**23.** As an alternative definition for the appropriate geographical area, SMUD proposes that the court draw a circle around the State Capitol, and include the area within a 25 mile radius. This may or may not provide a more accurate definition of the Greater Sacramento Metropolitan Area than can be derived from simply charting the defendant's service area. It would do nothing, however, to aid the court in determining the area of effective competition, for it would contain two distinct regions: One in which SMUD does not compete because it provides no service, and another within which SMUD need not compete because it provides virtually all of the electrical energy used.

that SMUD possesses monopoly power as that term is used in antitrust jurisprudence. What remains is to determine whether the plaintiffs have established that SMUD used that power to gain an unwarranted competitive advantage in other markets.

## V

### THE REMAINING ELEMENTS OF PLAINTIFF'S CLAIMS

1. *"Electrical Distribution Systems"*

Briefly summarized, the plaintiffs assert that SMUD has used the power it holds in the market for electrical energy to smother competition for the construction of "electrical distribution systems." It will be recalled that, according to the plaintiffs, an EDS consists of the wiring and other electrical distribution equipment connecting the consumer's home or other structure with SMUD power lines and related equipment at some point *off* of the consumer's property. *See* n. 5, *supra.* The parties agree that SMUD regularly runs distribution lines past the boundaries of its customers' property. In the most egregious case from the plaintiffs' standpoint, SMUD supplies all of the underground distribution equipment connecting private residences to SMUD power poles or similar equipment. SMUD generally does not permit its customers to employ other firms, such as the plaintiffs', to act in lieu of SMUD in constructing the portion of the EDS which SMUD constructs. This, the plaintiffs contend, is unlawful, for the construction of the entire EDS is a zone of commerce which must be left open to free competition.

As I have explained at length, the plaintiffs have satisfied the first element of their monopoly leveraging claim by showing that SMUD in fact possesses monopoly power. Moreover, the unrebutted evidence demonstrates that the plaintiffs have established the element that most concerned the court in *Berkey Photo:* There can be no doubt that SMUD's activities in this respect constituted a use of its monopoly power.

This can perhaps be most simply explained by noting that the cause of action for monopoly leveraging is "linked to the prohibition against tying arrangements in the sale of goods and services." *Berkey Photo,* 603 F.2d 263. At the core of that prohibition is the notion of "coercion," *i.e.,* the restriction of the consumer's freedom to purchase a product over which the defendant has market control by making the sale of that product conditional on the purchase of some separate product. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 540 (9th Cir.1983); *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1216–17. Thus in the instant case SMUD has used its control of the market for electrical energy to restrict its customers' freedom to have other firms construct "electrical distribution systems" on their property. Whatever uncertainty may exist regarding the precise meaning of the phrase "use of monopoly power," it surely was meant to embrace situations as familiar to antitrust law as the present one.

■ Past that, however, the plaintiffs' claim founders. Essential to either a tying claim or a monopoly leveraging claim is a showing that the product which the plaintiffs seek to supply is indeed separate from the product controlled by the defendant. *Times-Picayune Publishing,* 345 U.S. at 614, 73 S.Ct. at 883 (tying claim); *M.A.P. Oil,* 691 F.2d at 1306. In this case, the plaintiffs have failed to demonstrate (at least for summary judgment purposes) that what they refer to as the "electrical distribution system" comprises a product that is in any real sense separate from electrical energy.

The plaintiffs initially attempt to address this issue by invoking the traditional means of determining product market scope that are used in order to ascertain whether a firm possesses monopoly power. They point out, for instance, that there is no "cross-elasticity of demand" between the sale of electrical energy and the construction of EDS; nor are the two "products" "reasonably interchangeable." [24] While obviously

---

**24.** The plaintiffs also tender certain deposition testimony elicited from SMUD employees as evidence of the existence of "electrical distribution systems" as a separate economic entity. In the cited excerpts, the deponents do indeed refer to "distribution systems." They generally

it is true that consumers will not respond to price fluctuations in electrical energy by buying electrical distribution systems, that fact is not particularly helpful in the present context. It could as readily be argued that milk is a separate product from the container in which it is packaged, for if the price of milk rises, thirsty consumers will not attempt to drink the carton instead. Now milk and milk cartons may well constitute separate products in a given economic context; the point, however, is that the tools tendered by the plaintiffs are just not the right ones for the job of making that determination. In short, the devices usually employed by courts to define relevant markets or submarkets in order to test a purported monopolist's strength will not serve here, for they simply ask a different set of questions than those posed by the issue of separability of different things that function together.

This point is illustrated by the Ninth Circuit's decision in the *M.A.P. Oil* case. That was a lawsuit brought against a major petroleum corporation (Texaco, Inc.) by, *inter alios,* a number of independent wholesale distributors of Texaco gasoline. The plaintiffs alleged, among other things, that Texaco had used its "monopoly power" in the "market" for Texaco brand gasoline as a lever to gain unwarranted advantage in a separate market for "distribution services." These services allegedly included such things as "marketing advice, credit services, equipment loans, real estate improvements, and brand identification and pricing signs . . . ." 691 F.2d at 1307. The Ninth Circuit agreed that, "viewed in the abstract," under the criteria used to measure relevant submarkets, those services are "distinct from the simple delivery of gasoline." *Id.* The court decided, however, that a different inquiry was needed in order to ascertain

"the 'economic significance' of those services under the facts of [that] case." The Ninth Circuit noted that consumers did not purchase these services separately, and that, while some customers received fewer of the services than others, all nonetheless paid the same price. The court concluded:

> In short, economic reality suggests that none of plaintiffs' customers *purchased* "distribution services"; instead, those services were essentially marketing techniques designed to either initially obtain or subsequently retain a customer. [ ] Customers can choose between direct delivery of gasoline and delivery through distributors or commission agents, but in the final analysis they purchase a single product—gasoline.

*Id.* at 1307–08.

In a brief filed with the court after the publication of *M.A.P. Oil,* the plaintiffs argue that the Ninth Circuit's decision in that case supports their position. The plaintiffs point to the fact that SMUD charges consumers a "separate price" for some fraction of the distribution construction that it does. Specifically, as of 1978 SMUD charged $250.00 for installing an underground "service run" from a SMUD pedestal to a single family residence. The plaintiffs contend that, under *M.A.P. Oil,* this fact establishes that the "electrical distribution system" is a product distinct from retail electrical energy.

The plaintiffs read both their own complaint and the *M.A.P. Oil* opinion too narrowly. In the first place, SMUD's underground "service run" to residential dwellings encompasses only a small portion of what the plaintiffs define as the market for "electrical distribution systems." There is no claim that SMUD makes a separate charge for the bulk of the work that it does

do so, however, only after plaintiffs' counsel has introduced the term and repeatedly used it in the questions propounded. (It will be noted that the court has also adopted the term, not because it is convinced that the term has any actual significance, but merely in order to respond to the allegations. *See* n. 5, *supra* ). Moreover, in context it is unclear whether the deponents are referring to the things defined by the plaintiffs as "electrical distribution sys-

tems"; the witnesses could well be using the term to describe some larger or smaller portion of what they clearly think of as "SMUD's plant." The inquiry into the separability of energy from EDS is simply not susceptible to resolution through this sort of wordplay; nor can such a complex factual issue be resolved by putting buzz words in the mouths of witnesses. In short, the court finds this "evidence" wholly unpersuasive.

installing distribution networks on the premises of industrial, commercial, or multi-family residential customers. For that matter, there is no charge for most of the installation work done on "electrical distribution systems" serving single family homes, given that plaintiffs define those systems as commencing at the outer property line of each residential subdivision in which such homes are located. If their interpretation of *M.A.P. Oil* is correct, the plaintiffs have provided the court with an entirely inaccurate definition of the leveraged market.

More importantly, the plaintiffs have misapprehended the significance of the Ninth Circuit's opinion. In focusing on the fact that only one price was paid by customers, the court was not setting that as the test for whether the alleged "products" were separate or unitary. If that were the test, a monopolist could sell two distinct products, and simply by absorbing the cost of the "leveraged" product into a single, inflated price for the "monopolized" product it could defeat any claim that it had leveraged its monopoly power. Moreover, the plaintiffs' interpretation would compel the conclusion that the Ninth Circuit has implicitly repudiated the "tying" cases in which, facing the same analytical problem of separability, that court determined that a single price had been set for what were indeed two distinct products. *See, e.g., Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 47–49 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972).

The important teaching of *M.A.P. Oil* is that the question of whether two things are one product or two for purposes of monopoly leveraging analysis is determined, finally, by examining the "economic significance" of those things from the point of view of the consumer. Whether customers pay one price or two is significant (if at all) only to the extent that it provides an indication of what it is that those consumers are in fact purchasing in a specific context. This proper focus on the consumer's viewpoint is only another recognition of the fundamental principle that "[t]he antitrust laws ... were enacted for 'the protection of *competition,* not *competitors* ....' " *Brunswick*

*Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701, *quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Whether real or potential competition exists for the provision of a given good or service depends on the existence of consumer demand, not on a firm's decision regarding the sort of work that it would like to do.

Understood in this way, the *M.A.P. Oil* decision is entirely consonant with the manner in which the Ninth Circuit has approached the separate product problem in tying cases. "In this circuit, [the court of appeals has] looked carefully at the 'function of the aggregation' in order to determine whether only a single product is sold." *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1215 (9th Cir.1977), *citing Siegel,* 448 F.2d at 48; *accord, Klamath-Lake Pharmaceutical Ass'n. v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1289 (9th Cir.1983), *petition for cert. denied,* 51 U.S.L.W. 3884 (U.S. June 2, 1983) (No. 82–1969). As Kintner points out, this "functional approach focuses on what the purchaser desires to acquire." II Kintner, *Federal Antitrust Law* § 10.54 at 229. Thus, under the Ninth Circuit's analysis,

> [t]he critical factor is the extent to which a producer's offerings are in response to independently structured consumer demand. Products that function together and are sold in combination may still be "separate" if consumers would prefer to buy them individually at the price necessary to market them separately. [...] Whether a producer's combined products should be considered as separate can be decided only by looking at consumer behavior. It is the relationship of the producer's selling decision to market demand, not the physical characteristics of the products alone, that determines the existence of legally separable products.

*Klamath-Lake Pharmaceutical,* 701 F.2d at 1289 (footnote omitted).

The evidence tendered by SMUD on this point speaks directly to the approach taken by the Ninth Circuit. That evidence demonstrates, for purposes of this motion, that SMUD has successfully attempted to define

the boundaries of its distribution network by the demands of the specific classes of customers it serves. According to the affidavits submitted by the defendant, SMUD carries electricity in the voltage needed by the customer up to the point where it can be conveniently connected to the customer's electrical wiring system.

Examined in the light most favorable to SMUD, and resolving all factual disputes in the defendant's favor, one can elicit the following concrete examples: In bringing power to private residences SMUD transports electricity in a low voltage right up to the house, and leaves it to the homeowner (or developer) to arrange for the installation of wiring and equipment to the specific sorts of outlets desired at the locations within the house where the property owner wishes them placed. Similarly, when serving large industrial customers, SMUD will carry power in a higher voltage to a point on or near the premises, and lets the customer "step down" the electricity to the levels it needs and transmit that power—perhaps in varying voltages—to the structures in which it will be used. Finally, when conveying electricity to multi-use structures such as apartment buildings and shopping centers, SMUD stops at a point where the property owner can install a sys-tem that serves the uses to which the owner wishes to commit the property, and permits the owner flexibility in changing those uses in the future.

Thus, viewed in the manner prescribed by Rule 56, the evidence shows that SMUD's network stops in any given instance right at the point that the consumer's specific needs dictate the construction of an individualized distribution system. Put in other terms, SMUD constructs distribution facilities to the extent, and only to the extent, that the consumer has no interest in those facilities independent of the desire to obtain raw electric power—or so a jury could reasonably conclude based on the evidence now before the court. Under the appropriate functional analysis it appears, therefore, that the plaintiffs have not met their burden of showing that "electrical energy systems" are a product distinct from retail electrical energy.[25] Rather, for purposes of parsing this claim in the instant motion, the court concludes that SMUD is correct in asserting that it sells only one product—electricity. Accordingly, the plaintiffs' motion for summary judgment must be denied insofar as it relates to their claim that SMUD used its monopoly power as a lever in a separate market for "electrical distribution systems".[26]

**25.** It should be noted that if the court adopted the recognized alternative method of analyzing this issue, SMUD's position would be stronger still. According to Kintner, the "second approach that has been utilized to establish a product's 'separateness' is to focus on each product's market." II Kintner, *Federal Antitrust Law* § 10.54 at 230. The leading case putting forth this second analysis is *Washington Gas Light Co. v. Virginia Electric & Power Co. (VEPCO)*, 438 F.2d 248, 253 (4th Cir.1971). The facts of that case are remarkably similar to those of the case at bar. The defendant, an integrated electric utility company, began installing "'underground residential distribution' (URD) lines instead of the common overhead variety if the builder agreed to pay the additional expenses involved, usually amounting to a sum around $280." *Id.* at 250. VEPCO subsequently decided to offer URD installation free to builders who "went 'all electric.'" *Id.* The local gas company sued, claiming, inter alia, that VEPCO's practices constituted an illegal tying arrangement under § 1. The trial court held in favor of the plaintiff, but the Fourth Circuit reversed, ruling that the

plaintiff had failed to show two separate products. The court of appeals took the view that URD "'is merely a method by which a product—electricity—is delivered to the consumer. [...] Underground Residential Distribution is ancillary to both the seller and the buyer in much the same way as a free meal given to an airline passenger is ancillary to the sale of an airline ticket. Therefore, it is difficult to see how there could be a separate tying product in the commercial sense.'" *Id.* at 254, *quoting Gas Light Co. of Columbus v. Georgia Power Co.*, 313 F.Supp. 860, 869 (M.D.Ga.1970).

**26.** Given that the plaintiffs have failed to satisfy this basic element of their EDS claim, it is not necessary for the court to reach the remaining elements. It is by no means clear, however, that SMUD's activities could in any event be considered so "unreasonable" as to constitute the taking of "an unwarranted competitive advantage." *See* the discussion in Part III of this opinion, *supra*. In this regard, I note the evidence tendered to the court showing that the cost to consumers would necessarily rise if someone other than SMUD did the disputed

### 2. "Street and Outdoor Lighting Systems"

█ As I have explained, the plaintiffs cannot succeed in their motion for summary judgment on their claim regarding "electrical distribution systems" because they have failed to satisfy an essential element of the monopoly leveraging claim as articulated in *M.A.P. Oil, i.e.,* the distinction between the "leveraging" product and the "leveraged." Their claim regarding "street and outdoor lighting systems" fails on the even more fundamental ground which formed the basis for the *Berkey Photo* decision itself. Simply put, the plaintiffs have not established that any of SMUD's alleged activities in this area constitute a use of monopoly power as such. Without meeting this quintessential element, the plaintiffs cannot prevail.

Street lighting systems and outdoor lighting systems are each described in Part II of this opinion. As I noted there, these terms seem, at least at first blush, to describe two different things. Nonetheless, the plaintiffs assert that together they describe a single product, which they define as follows: "A street and outdoor lighting system is the entire street or outdoor lighting equipment from the source of energy feed for the lighting equipment to and including the lighting fixtures on public and private property." Plaintiff's Memorandum filed September 14, 1981, at 26.[27]

The plaintiffs point to four specific ways in which SMUD has allegedly used its power in the market for electrical energy to "smother competition" in the purported market for street and outdoor lighting systems. First, they assert that SMUD unfair-

ly promotes its Rate 53 by informing potential customers who inquire about street lighting that SMUD will construct and maintain such a system at no initial cost to the customer. Second, the plaintiffs contend that SMUD abuses its power by offering "package rates" (like Rate 53) at an "anticompetitive price." What plaintiffs are apparently referring to is, once again, the fact that SMUD builds and maintains both street lighting systems and outdoor lighting systems without requiring the customer to pay immediately for the capital costs; rather, it absorbs those costs into its rate structure and recoups them by charging a higher monthly rate to customers who avail themselves of that service. Third, the plaintiffs complain specifically about this amortization process. Lastly, the plaintiffs charge that SMUD takes advantage of its monopoly position by using its own utility poles as places to mount security lights without letting the plaintiffs climb or mount anything on these poles.

The issue is whether any of these practices constitutes a use of SMUD's power *as a monopolist.* In *Berkey Photo,* Judge Kaufman repeatedly distinguishes between the (unlawful) use of monopoly power and the legitimate use of advantages which the monopolist enjoys by virtue of other reasons, such as size, integration, foresight, business acumen and the like. 603 F.2d at 274–76, 281, 283, 291 & n. 50. Thus

[t]he key to analysis, it must be stressed, is the concept of market power. Although power may be derived from size, ... the two are not identical. A firm that has lawfully acquired a monopoly position is not barred from taking advan-

---

installation work. Moreover, this fact raises the question of whether the plaintiffs can show "causal antitrust injury." *See Forro Precision,* 673 F.2d at 1058. The question of SMUD's alleged leveraging in the "market" for "electrical distribution systems" may well be moot if it turns out that SMUD would have captured that market in any event, by underpricing the plaintiffs through use of competitive advantages apart from use of monopoly power. *See Berkey Photo,* 603 F.2d at 288; *see generally* the discussion of plaintiffs' "street and outdoor lighting systems" claim, *infra.*

**27.** I observe in passing that the plaintiffs have made no attempt to detail the limits of this purported market, either in terms of what should properly be included in the product definition, or in terms of the geographic area in which competition actually exists. Thus, as noted in Part III of this opinion, it is virtually impossible for the court to gauge the economic significance of the conduct which the plaintiffs assert is unlawful. Given the even more basic flaw in the plaintiffs' claim, however, it is unnecessary to plunge back into the thicket of market definition in order properly to dispose of the instant motion.

tage of scale economies by constructing, for example, a large and efficient factory. These benefits are a consequence of size and not an exercise of power over the market.

*Id.* at 274 (citations and footnote omitted). In other words, a firm is merely using legitimate competitive advantages if the advantages used are those that would accrue to any firm of similar size and sophistication, regardless of its share of market power. In contrast, "a use of monopoly power is an action that a firm would have found substantially less effective, or even counterproductive, if it lacked market control." *Id.* at 291.[28]

Whether a given course of conduct constitutes a use of monopoly power is again a question of fact. *See Berkey Photo,* 603 F.2d at 292. Based on the evidence before the court, the jury could reasonably find that none of the activities of which the plaintiffs complain in this claim constitute a use of SMUD's monopoly power as defined in *Berkey Photo.* Only a monopolist can force its customers to accept a product that they would not otherwise purchase at the price tendered, but any firm can use the regular contact it has with its customers to promote a new product. The fact that the firm which promotes a product in that fashion is a monopolist does not necessarily render the promotion a use of monopoly power.

Similarly, any firm of sufficient size and organization can offer goods or services without immediately receiving payment in full, even if great capital expenditures are involved. Clearly the jury could conclude that the fact that SMUD can afford to offer "package deals" (*e.g.,* its Rate 53 arrangement) can be ascribed to its size and integration, rather than to its control of the electric energy market. Indeed, there does not appear to be any reason why SMUD could not offer similar arrangements if it only controlled, say, one-half or one-quarter of the market in which it now functions.

Finally, the fact that SMUD uses its own utility poles to mount security lights does not in itself demonstrate a use of monopoly power. As the court emphasized in *Berkey Photo,*

[A] large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad-based activity—more efficient production, greater ability to develop complementary products, reduced transaction costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.

603 F.2d at 276. Nor is the character of SMUD's conduct necessarily changed by its refusal to allow the plaintiffs to climb its utility poles or mount devices on them. Although the plaintiffs have demonstrated that SMUD has monopoly power, there is no evidence that SMUD controls all or most

---

**28.** Certain examples help illuminate this distinction. "A classic illustration [of the use of monopoly power] is an insistence that those who wish to secure a firm's services cease dealing with its competitors." *Berkey Photo,* 603 F.2d at 275. Yet another "classic example of such a use is a refusal to deal in goods or services needed by a competitor in a second market. But, a firm without control of the market that attempts this will simply drive the purchaser to take its patronage elsewhere." *Id.* at 291 (citation omitted). Finally, in this opinion I have discussed the use of monopoly power to force a consumer to purchase a second product in combination with the product over which the seller exerts market control.

*See* Part V, *supra.* In each of these instances it is *solely* the monopolist's control of the primary market that permits it to act as it does, and to do so effectively. This same factor is present in each of the cases cited by the plaintiffs in support of their contention that SMUD has used its monopoly power to gain advantage in the "market" for "street and outdoor lighting systems." *See Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; *Six Twenty-Nine Productions v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir.1966); *Packaged Programs v. Westinghouse Broadcasting Co.,* 255 F.2d 708 (3d Cir. 1958); *City of Mishawaka, Ind.,* 465 F.Supp. 1320 (N.D.Ind.1979).

of the poles in its service area; nor is there any evidence of a lack of other alternative sites upon which security lights could be mounted. Thus, contrary to what the plaintiffs suggest, SMUD's conduct is not the equivalent of a refusal by a monopolist to sell its product to another firm with which it is competing in a separate market. *See, e.g., Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir.1966); *Packaged Programs v. Westinghouse Broadcasting Co.,* 255 F.2d 708 (3d Cir.1958).[29]

In short, the evidence now before the court suggests that a reasonable jury could find that SMUD has not used its monopoly power to gain an advantage—warranted or unwarranted—in any market for "street and outdoor lighting systems." The plaintiffs motion for summary judgment on the elements of this claim must also be denied.

### Conclusion

The monopoly leveraging theory announced in *Berkey Photo* appears to describe an analytically new antitrust offense; we are taught, however, that it is merely a variant of the offense of monopolization. In either case, it requires a substantially different mode of analysis than that generally applied under § 2. Having ascertained the elements of the plaintiffs' claim, the court concludes that the plaintiffs failed to meet their burden of showing the absence of a genuine issue of material fact in regard to those elements. Accordingly, this portion of the plaintiffs' motion for summary judgment is hereby denied.

IT IS SO ORDERED.

---

**29.** I note SMUD's assertion that its action is based upon safety considerations and the need to maintain the integrity of its poles. By reason of the foregoing analysis, it is unnecessary to determine whether these tendered justifications would be sufficient to justify its rule and thus not make its action "unreasonable" in any event.