ASSOCIATION FOR INTERCOLLEGI-
ATE ATHLETICS FOR WOMEN, a
Non-Profit Corporation, Appellant,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, an Unincorporated
Association, Appellee.

No. 83–1342.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 1984.

Decided May 18, 1984.

Katrina Renouf, Washington, D.C., with whom Margot Polivy, Washington, D.C., was on brief, for appellant.

Eben G. Crawford, Cleveland, Ohio, of the Bar of the Supreme Court of Ohio, pro hac vice, by special leave of court, with whom William D. Kramer and Judith Jurin Semo, Washington, D.C., were on brief, for appellee.

Before TAMM, WALD and GINSBURG, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

This appeal arises from an antitrust action brought by the Association for Intercollegiate Athletics for Women (AIAW) against the National Collegiate Athletic Association (NCAA). AIAW alleged that NCAA unlawfully used its monopoly power in men's college sports to facilitate its entry into women's college sports and to force AIAW out of existence. United States District Judge Thomas P. Jackson, after trial, found no antitrust violation and entered judgment for NCAA. On appeal, AIAW contests the district court's fact findings and legal analysis. Although we disagree in part with one portion of the district court's legal analysis, that court's disposition ultimately and properly turns on fact findings that are not clearly erroneous. We therefore affirm the district court's decision rejecting AIAW's claims.

I. BACKGROUND

From 1906 to 1980, NCAA sponsored programs only for men's intercollegiate athletics. In 1967, the Commission on Intercollegiate Athletics for Women (CIAW) was organized to provide a governing body for women's athletics. In 1971, CIAW was

transformed into AIAW, an organization that throughout its existence governed only women's sports. In 1971–72, AIAW sponsored seven national championships for its 278 members. By 1980–81, AIAW's membership had grown to 961 colleges and universities. AIAW's standing as the major governing body in women's sports ended, however, in the fall of 1981.

In the 1981–82 sports season, NCAA introduced twenty-nine women's championships in twelve sports. During the same season, AIAW suffered a significant drop in membership and participation in its events. AIAW's loss in membership dues totalled $124,000, which represented approximately twenty-two percent of the dues collected the previous year. Forty-nine percent of those institutions leaving AIAW elected to place their women's sports programs under NCAA's governance. Even among those schools that maintained AIAW memberships, a significant number chose to participate in NCAA events instead of the AIAW counterparts.

AIAW also suffered promotional losses. National Broadcasting Company (NBC) decided not to exercise its exclusive television rights to telecast AIAW championships. NBC's disinterest resulted in large part from a decline in the number and quality of participants in AIAW events. *Association for Intercollegiate Athletics for Women v. National Collegiate Athletic Ass'n,* 558 F.Supp. 487, 493 (D.D.C.1983). The Eastman Kodak Company and the Broderick Company, because of AIAW's participation losses, both sought to withdraw sponsorship of AIAW achievement awards. *Id.* at 493–94. AIAW's diminished stature following NCAA's entry into women's sports also hindered AIAW's efforts to market its logo. AIAW had further difficulty securing national championship sites, holding volunteer staff, and realizing profits from its Division I championship events. *Id.* Since AIAW's leadership expected these financial hardships only to worsen, it decided not to distribute membership renewal applications for the 1982–83 season. AIAW closed business on June 30, 1982.

On October 9, 1981, AIAW filed suit against NCAA in the United States District Court for the District of Columbia. AIAW alleged that NCAA violated sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, 3 (1982), by using its monopoly power in men's college sports to facilitate its entry into women's college sports and to force AIAW out of existence.[1] Specifically, AIAW asserted that NCAA's unlawful conduct consisted of predatory pricing, the use of financial incentives to "link" the sale of competitive services with the sale of monopoly services, and an illegal tying arrangement.

## A. NCAA's Contested Conduct

### 1. NCAA's Dues Policy

Before NCAA introduced women's events, NCAA members paid a single flat fee for the option of participating in all the events in their respective NCAA divisions. For the 1981–82 season, NCAA did not increase its flat rate, or charge a separate fee, for those members participating in the newly instituted women's events. NCAA continued this practice through June 1982

---

**1.** Sections 1, 2, and 3 of the Sherman Act provide in pertinent part:

> § 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
> § 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ....

> § 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce ... between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal.

15 U.S.C. §§ 1, 2, 3 (1982). Since § 3 tracks the language of § 1, AIAW's § 3 claim will be treated in the same manner as its § 1 claims.

when AIAW closed business. AIAW asserts that the price for participating in a college sports program is the membership dues associated with that program. Since NCAA's "price" for participation in its women's program was effectively zero and thus well below the cost of the program, AIAW cites NCAA's dues policy as a classic example of predatory pricing.[2]

### 2. NCAA's Proceeds Distribution Formula

Before 1981, NCAA guaranteed both transportation and per diem expenses to participants in all its championships. Also, after event administration expenses were deducted from revenues generated by a championship, remaining proceeds were distributed 50% to NCAA and 50% to institutions competing in the championship. When NCAA began to sponsor women's events, however, it changed this proceeds distribution formula. Although NCAA continued to guarantee reimbursement of transportation expenses, per diem expenses for championships were paid only from surplus revenue after event administration costs had been covered. Any revenues that remained after paying per diem expenses were used first to repay NCAA for the travel allowance, and only then were distributed to participating institutions. NCAA readily concedes that these changes reduced the likelihood of teams receiving either per diem reimbursements or championship proceeds.

AIAW argues that revisions in NCAA's distribution formula created financial incentives for schools whose men's teams already participated in NCAA events to enroll their women's teams in NCAA as well. The revisions, notes AIAW, decreased payments to current men's participants substantially below their former level. Because NCAA has monopoly power in men's sports, it allegedly did not fear losing participants in men's events due to the reduced proceeds allocated to those events.

The only effect, AIAW argues, was to encourage coeducational institutions to enroll their women's programs in NCAA events to recoup lost proceeds shifted from men's to women's sports. AIAW contends that only by obtaining NCAA's relatively generous women's reimbursements could a coeducational institution avoid a net loss in subsidization for its entire athletic program. AIAW thus claims the revisions in NCAA's distribution formula produced irresistible inducements for coeducational schools to transfer their women's programs from AIAW to NCAA. These inducements allegedly constituted an "unlawful linkage," tantamount to a coercive tie, of women's events to the monopolized men's events.

### 3. NCAA's Sale of Television Rights

In the winter of 1981, NCAA negotiated the sale of television rights for its men's basketball championship with Columbia Broadcasting System (CBS) and National Broadcasting Company (NBC). In the course of negotiations, NCAA asked each network to clarify its position, *inter alia*, on a proposed rights fee for televising NCAA's women's basketball championship game. CBS originally offered $225,000 over three years for the women's basketball championship. NBC proposed $525,000 for the same television rights. NCAA, however, awarded CBS a contract covering both the men's and women's championships. NCAA's presentation indicates that its decision stemmed from CBS's offering some three million dollars more than NBC for the men's championship, and from the efficiencies of selling both championships to the same network.

AIAW contends, however, that NCAA tied the sale of television rights for its women's basketball championship to the rights for its men's counterpart. Because NCAA is a monopoly seller of television rights for men's college basketball championships, AIAW alleges NCAA was able to

---

**2.** NCAA stipulated that the projected cost of its women's program for its first year would be approximately three million dollars. NCAA ex-

pected only $300,000–$500,000 in revenues to be generated by the program for the same time. Record Excerpts (R.E.) at 104.

thrust its women's championship upon an unwilling purchaser. AIAW thus argues that CBS was forced to purchase the women's event, in which it had no interest, in order to obtain the men's event, which was of paramount importance.[3]

## B. *District Court's Decision*

The district court characterized NCAA, in one respect as an "[e]leemosynary organization [ ] ... [that] exist[s] primarily to enhance the contribution made by amateur athletic competition to ... higher education ...." 558 F.Supp. at 494. In another respect, the court found that NCAA was a "vertically integrated seller [ ] of governance and promotional services for athletic competition" and capable of considerable restraint on commercial enterprise. *Id.* at 494, 497. Because of its noncommercial dimension, the district court concluded that NCAA was not subject to liability deriving from conduct alone. Rather, "[s]ection 1 claims are judged under the Rule of Reason even when restraints are patent, and there must be proof of specific intent as a predicate to a finding of an abuse of monopoly power under [s]ection 2." *Id.* at 495 (citations omitted).

With regard to AIAW's monopolization claim, the district court found as a factual matter that NCAA did not achieve monopoly power in women's sports during the 1981–82 season, the sole year NCAA was in competition with AIAW. *Id.* at 501.[4] The district court thus considered only whether NCAA *attempted* to monopolize women's sports by means of its dues and reimbursement policies. *Id.* It concluded that AIAW failed to prove NCAA acted with the specific intent necessary to sustain an attempted monopolization claim. *Id.* at 506. The court upheld NCAA's dues and reim-

bursements policies on the alternative ground that AIAW did not prove a causal connection between NCAA's disputed practices and AIAW's economic injury. *Id.* at 506–07.

The district court also rejected AIAW's section 1 claims. First, the court found that AIAW failed to prove the requisite joint conduct, except with regard to the tying charge, on the part of NCAA. *Id.* at 498. The tying charge was rejected after the district court determined, as a factual matter, that NCAA did not condition the purchase of television rights for its men's basketball championship upon the purchase of the women's counterpart. *Id.* at 500. Having concluded that AIAW did not prove facts sufficient to constitute either a section 1 or 2 violation, the district court entered judgment for NCAA.

On appeal, AIAW contests portions of the district court's fact findings and legal analysis. Although we disagree in part with the district court's statement of how the antitrust laws apply to NCAA practices, we find no error in its ultimate conclusion that AIAW failed to prove any antitrust violation. Accordingly, we affirm the district court's judgment for NCAA.

## II. ANALYSIS

NCAA argues that its nonprofit status and affiliation with higher education warrant special treatment under the antitrust laws. Its position rests primarily on a much-discussed footnote in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788–89 n. 17, 95 S.Ct. 2004, 2013–14 n. 17, 44 L.Ed.2d 572 (1975). There, the Supreme Court indicated that practices of professional organizations may not be inter-

---

3. AIAW also claims all of NCAA's contested practices violated section 1 of the Sherman Act insofar as they represented the members' joint conduct that had the anticompetitive effect of restraining trade.

4. The district court defined the relevant submarkets as the men's and women's intercollegiate sports programs. 558 F.Supp. at 497. The court based this finding on the premise that the male and female athletic endeavor is fundamen-

tally different. The court observed that the sexes rarely compete on the playing field, and further found "little apparent 'true economic rivalry' between them, based upon factors of interchangeability, price sensitivity, and cross-elasticity of demand." *Id.* The court did not discuss whether markets might be divided not simply along sex lines, but based on the revenue production of the various intercollegiate sports.

changeable with those of commercial businesses for the purpose of antitrust analysis.[5] NCAA contends that practices of non-profit athletic associations are no more interchangeable with business activities than are practices of professions. NCAA therefore suggests that even where its conduct has significant anticompetitive consequences, that conduct may be justified by a motive to accomplish the legitimate non-profit goals of the association.

■ The district court agreed that NCAA's conduct alone, without regard to motive, could not give rise to antitrust liability. The court thus concluded that AIAW must demonstrate anticompetitive intent as well as effect to establish NCAA's civil antitrust liability under section 1 or 2 of the Sherman Act. 558 F.Supp. at 495. We reject the district court's position that intent is a separate and essential prerequisite to civil antitrust liability of organizations such as NCAA.[6] A party's intent is relevant only insofar as it helps predict the probable competitive impact of a disputed practice. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683

(1918); *Wilk v. American Medical Ass'n*, 719 F.2d 207, 225 (7th Cir.1983).

■ Our emphasis on competitive effect, as opposed to intent, comports with recent Supreme Court precedent dealing with regulatory or nonprofit organizations.[7] In *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), the professional organization essentially acknowledged the anticompetitive effect of its disputed conduct, but claimed that its legitimate professional purpose of maintaining quality engineering justified the commercial restraint. The Supreme Court rejected the organization's argument and instructed that noneconomic justifications generally do not cure significant anticompetitive effects. *Id.* at 692–96, 98 S.Ct. at 1365–67. *See also American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 573–74, 102 S.Ct. 1935, 1946, 72 L.Ed.2d 330 (1982). Accordingly, practices by non-profit organizations that economically disadvantage consumers are generally prohibited even though such practices may

5. Footnote 17 reads:

The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.
*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 778–89 n. 17, 95 S.Ct. 2004, 2013–14 n. 17, 44 L.Ed.2d 572 (1975).

6. *But see supra* note 9. The district court appeared to rely on *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc.*, 432 F.2d 650 (D.C.Cir.), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), in making intent an independent element of NCAA's antitrust liability. In *Marjorie Webster*, this court held that the Sherman Act did not apply to an allegedly exclu-

sionary accreditation policy because it found the policy "distinct from the sphere of commerce." *Id.* at 655. The court noted, however, that if it had discerned a commercial intent it could well have concluded that the educational facade of the accreditation policy only camouflaged a scheme very much directed at commerce. *Id.* at 654–55. Once the Sherman Act is found to apply to a disputed activity, as the district court found in the instant case, then competitive effect, and not intent, determines civil liability. *See id.* at 654.

7. We use "competitive effect" as a term of art to refer to the effect a practice has on the cost of providing goods and services. If the practice allows an entity to supply more goods for less cost, it has procompetitive effects. *See generally Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–56, 97 S.Ct. 2549, 2559-2560, 53 L.Ed.2d 568 (1977). If the practice excludes competitors or restricts output without decreasing the cost of production, the practice generally will increase the price of consumption and thus have anticompetitive effects. *See generally National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978).

be designed to advance independent social or political values.[8]

■ Although the district court's review of the law unduly emphasized intent, its disposition of AIAW's claims rested on fact findings as to the *de minimis* competitive impact and noncoerciveness of NCAA's disputed practices.[9] Because the district court had no occasion to apply its erroneous abstract analysis, its error was rendered harmless. FED.R.CIV.P. 61; *Ommaya v. National Institutes of Health,* 726 F.2d 827 at 830 (D.C.Cir.1984). To resolve this appeal, we accordingly turn to the precise grounds upon which the district court rejected AIAW's claims.

A. *AIAW's Claims Regarding NCAA's Dues Policy and Proceeds Distribution Formula*

AIAW asserts that NCAA used its dues policy as a predatory pricing scheme and its proceeds distribution formula to create "irresistible inducements" to facilitate its entry into women's sports. AIAW claims that such conduct constituted alternatively an unlawful monopolization, an attempt to monopolize, or at least an unlawful use of monopoly power in one market to damage competition in another market.

1. Unlawful Monopolization

■ To establish a monopolization claim, the plaintiff must demonstrate that the defendant in fact acquired monopoly power as a result of unlawful conduct. *United States v. Grinnell Corp.,* 384 U.S. 563,

570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *United States v. U.S. Steel Corp.,* 251 U.S. 417, 450–52, 40 S.Ct. 293, 298–99, 64 L.Ed. 343 (1920). The district court determined that NCAA had acquired no monopoly power in women's sports by June 1982. To prevail in this court on its monopolization claim, AIAW must demonstrate that the district court's factual conclusion was clearly erroneous. FED.R.CIV. P. 52(a). *See Halberstam v. Welch,* 705 F.2d 472, 486 & n. 16 (D.C.Cir.1983).

■ The district court based its finding on a comparison of NCAA's and AIAW's respective standing in women's sports for 1981–82. In its final year of existence, AIAW enrolled more members and offered twelve more women's championships in seven more sports than NCAA. *Association for Intercollegiate Athletics for Women,* 558 F.Supp. at 501. In every sport in which NCAA offered a women's championship, more NCAA members participated in the corresponding AIAW championship than in NCAA's championship. Docket Entry 65 at 29; Docket Entry 66 at 9 paras. 33, 33A. AIAW voluntarily ceased operations in June 1982, not because of current bankruptcy, but due to a business estimation of accelerating economic hardship in 1982–83. 558 F.Supp. at 494. Because we do not find clearly erroneous the district court's conclusion that NCAA had not acquired a monopoly in women's sports by June 1982, we affirm its dismissal of AIAW's monopolization claim.[10]

---

**8.** We acknowledge that some practices by nonprofit organizations may produce anticompetitive effects but still be essential to the organization's achieving its legitimate noncommercial objectives. In such case, we do not foreclose the possibility that achieving the essential noncommercial objective may justify some anticompetitive impact. *See generally National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 696 & n. 22, 98 S.Ct. 1355, 1367 & n. 22, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 55 n. 23, 97 S.Ct. 2549, 2560 & n. 23, 53 L.Ed.2d 568 (1977); *Wilk v. American Medical Ass'n,* 719 F.2d 207, 225–27 (7th Cir.1983).

**9.** The district court rejected AIAW's attempted monopolization claim on the sole ground that

NCAA had no specific intent to monopolize. The unique inchoate nature of the attempt offense, however, makes a finding of anticompetitive intent essential to liability. *See Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953).

**10.** We find no need to identify the quantity of market power that separates monopoly power from competitive standing. Given the rough equality of memberships, championship events, and participants between NCAA and AIAW, NCAA's standing in women's sports in 1981–82 did not approach the dominance usually held to represent monopoly power. *See United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (87% market share is monopoly power); *American Tobacco Co. v.*

## 2. Attempted Monopolization

■ Attempted monopolization consists of a specific intent to acquire monopoly power by means of exclusionary conduct and a dangerous probability that such conduct, if unchecked, would produce the desired monopoly. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626–27, 73 S.Ct. 872, 889–90, 97 L.Ed. 1277 (1953); *Swift and Co. v. United States*, 196 U.S. 375, 396, 402, 25 S.Ct. 276, 279, 281, 49 L.Ed. 518 (1905). Although AIAW proved that NCAA's eventual monopolization of women's sports was "a likelihood," 558 F.Supp. at 501, the district court found absent the requisite specific intent. *Id.* at 506.

■ AIAW asserts that the district court misconstrued the specific intent requirement by allowing altruistic motives to cleanse a purposeful attempt to monopolize. AIAW contends the district court held that NCAA intended to drive AIAW out of existence, but that such an intention was saved by NCAA's salutary motive to provide a singular governance and promotion system for women's sports. We agree that specific intent in attempted monopolization cases has little relation to the defendant's altruistic or malevolent motivations. Rather, specific intent in this context refers to a purpose to acquire monopoly power by driving one's rival from the market by exclusionary or predatory means.[11] The law thus inquires not *why*, but *whether*, one intends to acquire unlawful monopoly power. *See United States v. Grinnell Corp.*, 236 F.Supp. 244, 251 (D.R.I.1964), *rev'd in part on other grounds*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ After considering the district court's full discussion of AIAW's attempted monopolization claim, we conclude that the court properly applied the law on specific intent. The district court cited and found persuasive considerable record evidence indicating that NCAA viewed "the continued existence of AIAW as a healthy alternative to the NCAA ...," and that NCAA's objective was not "to take over women's athletics." 558 F.Supp. at 505, 506. The court then noted that NCAA's exhaustive and open debate on the appropriate objectives of its women's programs represented "the antithesis of ... conspiratorial plotting ... to acquire surreptitious control of a market ...." *Id.* at 506. Immediately thereafter, the court concluded that AIAW "failed to prove the specific intent necessary to sustain its claim of attempted monopoly." *Id.*

The district court's frequent reference to NCAA's contemplated co-existence with AIAW reflects the court's recognition that the relevant inquiry was whether NCAA intended to destroy AIAW. Furthermore, the court's conclusion that NCAA's adopting a women's program did not represent an attempt "to acquire surreptitious control of a market" indicates that it resolved the relevant inquiry in the negative.[12] We

---

*United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (80% control over field of comparable products is monopoly power); *United States v. Aluminum Co. of America*, 148 F.2d 416, 429 (2d Cir.1945) (90% of relevant market constituted monopoly power).

**11.** We emphasize that only one who intends to monopolize through unlawful means, as opposed to legitimate competition, possesses the requisite specific intent. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626–27, 73 S.Ct. 872, 889–90, 97 L.Ed. 1277 (1953) (specific intent to monopolize not shown by expansion impelled by legitimate business aims); *Lorain Journal Co. v. United States*, 342 U.S. 143, 154, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951) (preservation of monopoly power through "predatory commercial behavior" sus-

tains attempted monopolization claim). *See also Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 273 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) ("[An] intent to triumph in the competitive market, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation." (quoting *Hayes v. Solomon*, 597 F.2d 958, 977 (5th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)).

**12.** AIAW argues that the district court, even in the absence of direct evidence of specific intent, should have inferred this intent for attempted monopolization from NCAA's allegedly anticompetitive conduct. *See Northrup Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1058 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 156, 78

accordingly affirm the district court's finding of no attempted monopolization.[13]

### 3. Leveraged Use of Monopoly Power

AIAW's third section 2 claim alleges that NCAA unlawfully *distorted* competition in women's sports, even though NCAA may not have *sought* or *gained* a monopoly in the market. NCAA allegedly caused this "distortion" by using its monopoly power in men's sports as a "lever" to facilitate its entry into women's sports. AIAW relies primarily on *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), to support the legal sufficiency of its leveraging claim. In *Berkey Photo*, the Second Circuit held that "a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market.... That the competition in the leveraged market may not be destroyed but merely distorted does not make it more palatable." *Id.* at 275. *See also M.A.P. Oil Co. v. Texaco, Inc.*, 691 F.2d 1303, 1305–06 (9th Cir.1982); *Grason Elec. Co. v. Sacramento Mun. Util. Dist.*, 571 F.Supp. 1504, 1513–19 (E.D.Cal.1983).

[■■■■■] Assuming *arguendo* that leveraging is a distinct section 2 offense,[14] we note that a plaintiff still must prove the disputed use of monopoly power in fact caused economic injury and that such use was unlawful.[15] *See, e.g., MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1161–62 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 793–94 (5th Cir.1983). AIAW argues that NCAA's dues policy and proceeds distribution formula were the unlawful means by which NCAA used its monopoly power in men's sports to injure AIAW's standing in women's sports. The district court, however, found that AIAW failed to establish the causal relationship between NCAA's disputed practices and AIAW's economic injury:

> [P]laintiff's evidence with respect to the blandishments [i.e., "free dues" and travel reimbursements] offered by the NCAA is both imprecise and contradictory, and it does not support a conclusion that the NCAA, in effect, bought defectors from AIAW with its superior economic resources.

L.Ed.2d 144 (1983); *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). The record does not support a conclusion that the district court's failure to infer intent was clearly erroneous, especially in light of the fact that NCAA's disputed conduct was not on its face exclusionary and governed essentially noncommercial activity. *See infra* § II A 3.

**13.** The court's finding that AIAW failed to prove NCAA's conduct derived from a specific intent to monopolize suffices to dispose of AIAW's conclusory charge of a conspiracy to monopolize on the part of NCAA officials and/or members. *See generally Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1377 (10th Cir.1979). We therefore do not reach the question of whether NCAA's practices represented the joint conduct necessary to support a conspiracy claim.

**14.** We emphasize that we merely assume for the purposes of argument, and do not affirm, the legal sufficiency of the leveraging offense described in *Berkey Photo*. In light of the substantial academic criticism cast upon the leveraging

concept, we reserve for a case in which decision of the question is necessary the issue of whether leveraging is an independent section 2 offense separate from monopolization and attempted monopolization. *See, e.g.,* R. POSNER & F. EASTERBROOK, ANTITRUST, 802–10, 870–71 (2d ed. 1981); R. BORK, THE ANTITRUST PARADOX, 365–66, 372–75 (1978); Markovits, *Tie-ins, Leverage, and the American Antitrust Laws,* 80 YALE L.J. 195, 199–205 (1970); Bowman, Jr., *Tying Arrangements and the Leverage Problem,* 67 YALE L.J. 19, 21–29 (1957).

**15.** Courts recognize that "use" of monopoly power is not synonymous with "abuse" of that power. *See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 545–46 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984); *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76, 79, 87 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Rather, only use of monopoly power to restrict output or exclude competitors, as opposed to promoting the efficiency of production, is unlawful. *Id.*

558 F.Supp. at 506–07. The district court thus concluded that the competitive impact of NCAA's dues and reimbursement policies was essentially *de minimis. Id.*

A review of the record does not reveal that the district court's conclusion was clearly erroneous. *See Bellevue Gardens, Inc. v. Hill,* 297 F.2d 185, 186–87 (D.C.Cir. 1961). The court observed that two former AIAW presidents were unable to refer specifically to any institution that left AIAW in 1981–82 due to NCAA's "economic incentives." 558 F.Supp. at 506; R.E. at 287, 289–92, 361–65.[16] Moreover, several witnesses indicated that their institutions participated in NCAA championships, not to receive the alleged irresistible economic inducements, but rather because NCAA offered a superior product.[17] Thus, if AIAW's losses were NCAA's gains, the court properly concluded from substantial record evidence that the shift in membership and participation "was [not] the product of anything but direct competition." 558 F.Supp. at 506.

The court's conclusion is hardly remarkable given the nature of NCAA's dues and reimbursement policies. First, neither policy is exclusionary. The dues policy, which simply continued NCAA's past practice, did not make NCAA membership contingent on an institution's abstaining from AIAW's membership rolls or from participating in AIAW events. R.E. at 107. Additionally, the dues policy did not require NCAA members to enroll their women's programs in NCAA events or penalize them for not doing so. R.E. at 109. Similarly, the proceeds distribution formula did not condition reimbursement on exclusive NCAA mem-

bership or exclusive participation in NCAA events. 558 F.Supp. at 502. Indeed, NCAA agreed to judge female participants' eligibility according to NCAA rules or "the published rules of *any recognized state, conference, regional or national organization* of which an institution had been a member as of August 1, 1981 ...." *Id.* at 503 (emphasis added). The disputed NCAA practices thus allowed coeducational institutions to maintain dual women's memberships and participate in both associations' events under either association's rules without suffering any penalty in membership dues or reimbursements.

Second, neither NCAA's dues nor its reimbursement policy sprung from a predatory intent that could indicate a potential anticompetitive effect. As discussed above, the district court rejected AIAW's argument, on the basis of insufficient persuasive evidence, that NCAA's purpose was to monopolize women's sports by unlawfully driving AIAW from the market. *See supra* § II A2. AIAW thus failed to prove that either policy represented anything other than NCAA members' rational judgment of how best and most equitably to promote men's and women's intercollegiate athletics.

Finally, both the dues policy and the reimbursement formula governed essentially noncommercial conduct. The dues policy regulated only the flow of funds from NCAA members to the association; it did not affect members' or the association's dealings with third-party commercial enterprises. *Cf. Board of Regents of Univ. of Okla v. NCAA,* 707 F.2d 1147 (10th Cir.) (NCAA proscription of members' individual

**16.** AIAW nevertheless cites the testimony of several witnesses who indicated their instutitions moved to NCAA in part because they feared "bucking the leadership" of NCAA. This, however, does not undercut the district court's conclusion that neither the dues policy nor the proceeds distribution formula provided irresistible economic inducements to leave AIAW for NCAA.

**17.** The district court noted the following reasons cited by NCAA witnesses for moving to NCAA: NCAA's superior management and promotional resources, its philosophic emphasis on

competitive excellence as distinguished from maximum participation irrespective of ability, its future promise of a uniform rules structure for both sexes, and championship competitions by conferences (comprised of institutions of comparable proficiency located in several states) rather than by "state" and "region" in which teams tend to be of disparate ability. 558 F.Supp. at 506. *See, e.g.,* R.E. at 180–81, 388–89; Cerra Deposition (Dep.) at 3–8; Finch Dep. at 11–13; Frank Dep. at 8–9, 12; Holland Dep. at 4–7; Toner Dep. at 4–8.

sale of television rights violates the Sherman Act), *cert. granted,* —— U.S. ——, 104 S.Ct. 272, 78 L.Ed.2d 253 (1983). Despite AIAW's effort to characterize NCAA's dues as a predatory pricing scheme, we believe the dues format is more accurately viewed as a mechanism by which members established the appropriate amount each must contribute to the organization.[18] We conclude NCAA's dues policy was essentially an internal housekeeping matter that did not provide a means by which members or NCAA itself directly engaged in commerce. Similarly, we construe NCAA's reimbursement formula as a regulation governing the internal redistribution of NCAA's revenues among its members. Like the dues policy, the formula did not

bear on members' or NCAA's interaction with third-party commercial enterprises.[19]

■■■ That NCAA's disputed practices were not exclusionary, did not spring from a predatory intent, and regulated essentially noncommercial conduct further suggests that these practices would have a *de minimis* competitive impact. We therefore are especially reluctant to disturb the district court's factual assessment, based on substantial record evidence, to the same effect. We accordingly affirm the district court's holding that AIAW failed to establish that it suffered antitrust injury as a result of NCAA's dues policy or proceeds distribution formula.[20]

---

**18.** AIAW characterizes NCAA's dues charge as the *price* for participating in its sports events. In this scenario, NCAA becomes the seller, its members become the buyers, and the product is the opportunity to participate in NCAA sports. AIAW then emphasizes the market division between men's and women's sports, and notes that NCAA neither raised its dues nor charged a separate fee upon introducing women's sports. AIAW concludes that NCAA offered a separate product at no charge, the cost of which was subsidized by monopoly profits from men's sports.

We reject AIAW's characterization. *See, e.g., Jones v. NCAA,* 392 F.Supp. 295, 303 (D.Mass. 1975) ("The [antitrust] plaintiff is currently a student, not a businessman in the traditional sense, and certainly not a 'competitor' within the contemplation of the antitrust laws."). Even if we address AIAW's argument on its own commercial terms, however, we still find it unpersuasive. First, it strains the meaning of "price" as a recoupment of costs or a gauge of a commodity's value to conclude that NCAA uses its membership dues to "price" participation in its events. Both parties stipulated that NCAA's generating revenues derive primarily from championships and the sale of television rights. In 1979–80 and 1980–81, these two sources accounted for 82% and 83% respectively of NCAA's total revenues. R.E. at 95. If NCAA's dues charge is seen as its price for participation in NCAA events, we would be forced to conclude that NCAA prices below cost virtually every sports program it offers.

Second, the logic of predatory pricing does not readily apply to the facts at hand. Pricing below cost has been held unlawful on the ground that it allows the predator to drive weaker competitors from the market and then reap monopoly profits before new competitors can enter the market. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,*

668 F.2d 1014, 1031–32 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982). In the instant case, however, it would be nonsensical to presume NCAA's members were lowering the price of NCAA women's sports to drive AIAW from the market in order thereafter to charge *themselves* monopoly prices. Additionally, there is nothing in the record that implies NCAA could or believed it could extract monopoly profits from the networks for the right to televise women's sports by driving AIAW from the market.

**19.** Other courts have indicated that regulations governing noncommercial activity are unlikely to produce significant anticompetitive effects. *See, e.g., Marjorie Webster Jr. College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc.,* 432 F.2d 650, 654–55 (D.C.Cir.) (school accreditation policy), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *Nara v. American Dental Ass'n,* 526 F.Supp. 452, 457–58 (W.D.Mich.1981) (regulations prohibiting misleading advertising, false claims of specialists status, and use of unlicensed personnel); *Selman v. Harvard Medical School,* 494 F.Supp. 603, 621 (S.D.N.Y.) (medical schools' admissions policies), *aff'd,* 636 F.2d 1024 (2d Cir.1980); *Jones v. NCAA,* 392 F.Supp. 295, 303–04 (D.Mass. 1975) (eligibility standards for intercollegiate athletics). We do not assert that regulations governing noncommercial activity are exempt from the Sherman Act. Rather, we assert only that such regulations carry less potential of significantly restraining commerce than do regulations governing commercial activity.

**20.** AIAW also claimed that NCAA's dues policy and proceeds distribution formula represented joint conduct by which NCAA members restrained trade in violation of section 1 of the Sherman Act. Because AIAW failed to prove a

B. *AIAW's Claims Regarding NCAA's Sale of Television Rights*

AIAW contends that NCAA tied the purchase of television rights for its women's basketball championship game to the purchase of its men's counterpart. AIAW argues that such a tie is both a *per se* violation under section 1 and the unlawful means by which NCAA monopolized, attempted to monopolize, or gained a competitive advantage in women's sports in violation of section 2. The district court agreed that NCAA had sufficient economic power in men's basketball championships to appreciably restrain competition for the television rights in women's basketball championships. 558 F.Supp. at 498. It also found that a "not insubstantial" amount of interstate commerce was affected. *Id.* The district court concluded, however, that NCAA in fact had not used this power to impose a tied sale on the television networks. *Id.* at 500. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* — U.S. ——, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984) (forced sale of allegedly tied product essential to tie-in violation). AIAW again is faced with the heavy burden of demonstrating that the district court's factual conclusion was clearly erroneous.

AIAW focuses on three points in attacking the district court's finding of no coercive tie. First, AIAW notes that NCAA requested CBS and NBC to respond to twenty-three "conditions" in submitting their bids for the men's championship. One such "condition" requested the networks to assign a separate fee to NCAA's women's basketball championship game. R.E. at 509. Second, AIAW points out that both NBC and CBS felt obliged to submit such a bid. Finally, AIAW cites NCAA's awarding CBS its women's championship even though NBC's bid on the women's event was substantially higher. AIAW

contends that these three facts, taken together, demonstrate conclusively that NCAA would sell its men's championship only to a network that agreed to purchase NCAA's women's championship. For the reasons presented below, we reject AIAW's argument.

The "conditions" submitted to CBS and NBC were more precisely a list of items on which NCAA requested the networks to articulate a clearly defined negotiating position. The list was prefaced by the following instructions:

> The NCAA Basketball Negotiations Committee requests that NBC [and CBS] Sports respond in written form to each of the items listed below. In those instances where the NCAA has stated its position, please indicate if NBC [and CBS] agree [ ] or disagree [ ] in each case. If NBC [or CBS] wishes to modify the NCAA's position in any way, it should do so in its written response. In any event, NBC [and CBS are] expected to fully clarify [their] position[s] on each of the items listed below . . . .

R.E. at 508. These instructions do not require the networks to agree with NCAA on any of the items for negotiation to purchase the television rights for the men's championship. Indeed, NCAA assumed no position with regard to the value of its women's championship game, but simply asked the networks for their view of its economic worth. We find nothing in NCAA's submission to the networks that indicates the men's event would be sold only to one who also purchased the women's event.

The district court found, as AIAW asserts, that NBC and CBS felt obliged to submit some bid for NCAA's women's championship. 558 F.Supp. at 499. The networks' bids, however, represent only their acknowledgment of practical commer-

---

causal connection between NCAA's dues and reimbursement policies and AIAW's economic injury, those policies may not be used as a predicate for a section 1 violation. *See Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1195–96 (6th Cir.1982). We therefore affirm the district court's holding that neither

practice transgressed section 1 or 3 of the Sherman Act. We note, however, that we have no occasion to review, and thus do not affirm, the district court's finding that these NCAA practices did not represent the *joint* conduct necessary for all section 1 violations. 558 F.Supp. at 498–99.

cial reality: Buyers must give some response to a seller's proposal if negotiations are to proceed in an orderly fashion. R.E. at 444. We find no evidence demonstrating that had either network assigned a value of zero to the women's event, the possibility of purchasing the men's event would have been foreclosed.[21] Indeed, the President of NBC Sports and head of NBC's negotiating team testified that he did not consider the coverage of the women's championship to be a significant part of the negotiations for the men's tournament. *Id.* Most important, AIAW has cited no evidence demonstrating that CBS was coerced into purchasing a tied product for which it had no use.[22]

■ Finally, AIAW argues that NCAA's intent to impose a tying arrangement on the networks was demonstrated by NCAA's awarding the *women's* championship to the network that submitted the higher bid for the *men's* championship.[23] AIAW contends that NCAA's refusal to award each event separately to the higher

bidder demonstrates that the two events were inextricably and unlawfully knotted. Given, however, the potential efficiencies of awarding the men's and women's championships to the same network, we cannot presume a coercive tie between two products from the sole fact that both products were sold to the same bidder.[24]

■ In short, we find sufficient evidence to support the district court's conclusion that coverage of the women's championship game was not a *sine qua non* of a contract for the men's. Consequently, we reject AIAW's claim that NCAA's sale of television rights constitutes anti-competitive conduct violative either of section 1 or section 2 of the Sherman Act.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's holding that AIAW failed to prove NCAA's dues policy, proceeds distribution formula, or sale of television rights violated the Sherman Act.

*Affirmed.*

21. NCAA Executive Director Walter Byers, who was NCAA's primary negotiator with the networks, testified that AIAW's claim regarding the tying arrangement was unfounded:

> [W]e did *not* condition purchase of the rights to the men's championship on purchase of the women's championship. To the best of my knowledge, CBS, which got the contract, affirmatively wanted the rights to our women's basketball championship; and it also affirmatively proposed to buy the rights to the NCAA women's gymnastic championship.

R.E. at 383–84.

22. In addition to the men's and women's basketball championship, CBS bought the television rights to five other NCAA championships, two of which involved women's sports. The minutes of the NCAA's final negotiations with CBS for the sale of television rights indicate that CBS believed that even these other championships represented "good, strong legitimate programming." R.E. at 425.

AIAW concedes that it has no personal knowledge that NCAA tied the rights to its women's championship to those for its men's championship. 558 F.Supp. at 500. AIAW offers as circumstantial evidence of CBS's lack of interest in the women's championship CBS's failure to carry any women's collegiate championship before 1981. We do not find the sole fact that CBS changed its business strategy conclusive

proof of NCAA's forcing the women's championship on CBS. AIAW must proffer more persuasive evidence to demonstrate the clearly erroneous quality of the district court's factual finding of no coercive tying arrangement.

23. NBC bid $525,000 for the women's event and $45 million for the men's. CBS bid $225,000 for the women's event and $48 million for the men's. 558 F.Supp. at 499. CBS's bid for the women's championship was later increased to $375,000 pursuant to NCAA's request. *Id.*

24. NCAA could well have found the promotional and administrative efficiencies of awarding both championships to the same network worth more than the extra $300,000 NBC offered for the women's event. Such promotional efficiencies may include direct access during each event to an audience specifically interested in college basketball. Moreover, commentators' endorsements of the women's event during telecasts of the men's championship may be particularly effective in stimulating viewership for the women's championship. Also, a network may find it easier to encourage affiliates to cover women's basketball after the affiliate has already cultivated an audience for men's college basketball.

Administrative efficiencies may include securing uniform policies on commercial format, station breaks, and payment schedules for all NCAA basketball telecasts.